**E-Filed 7/21/2010**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

MOLLY STEARNS, et al.

Plaintiffs,

v.

SELECT COMFORT RETAIL CORPORATION, a Minnesota Corporation; BED BATH & BEYOND, INC. a New York Corporation; and THE SLEEP TRAIN, a California Corporation,

Defendants.

Case Number 08-2746 JF (PVT)

ORDER[1] GRANTING DEFENDANTS' MOTIONS TO STRIKE AND DISMISS, AND DENYING PLAINTIFFS' MOTION FOR LEAVE TO FILE THEIR FOURTH AMENDED COMPLAINT

[re: docket nos. 77, 80]

## I. BACKGROUND

**A. Procedural history**

On April 25, 2008, Plaintiff Molly Stearns ("Stearns"), a California resident, filed a complaint in the Santa Clara Superior Court alleging that she had found mold in a Sleep Number® bed purchased at Bed Bath & Beyond ("BBB") in 2000.  The complaint alleged claims for strict product liability, intentional misrepresentation, negligent misrepresentation, concealment, breach of express warranty, and breach of implied warranty.  Stearns also sought to

---

[1] This disposition is not designated for publication in the official reports.

bring a class action on behalf of all original purchasers and users of Sleep Number® beds manufactured between January 1, 1987 and December 31, 2005.  Defendants Select Comfort Retail Corporation ("Select Comfort") and BBB removed the action to this Court and then moved to dismiss all of Stearns' claims except for the product liability claim and to strike the class allegations.  On October 1, 2008, the Court dismissed the complaint with leave to amend. In striking Stearns' class claims, the Court noted the inherent difficulty of maintaining a class action arising from alleged personal injuries.  Dkt. No. 28 at 11-12.

On October 30, 2008, Stearns and additional named plaintiffs filed their first amended complaint ("FAC"), amending their previous claims and adding a new defendant (Sleep Train). The FAC also included new claims for relief based upon (1) negligence; (2) violation of the Magnusson-Moss Warranty Act ("MMWA"); (3) unfair competition pursuant to the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; (4) false advertising pursuant to the California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.*; (5) violation of Section 1 of the Sherman Act; (6) violation of California's Cartwright Act; (7) violation of the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750; (8) violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); (9) conspiracy in violation of RICO, 18 U.S.C. § 1962(d); and (10) violation of the Consumer Product Safety Act ("CPSA"), 15 U.S.C. § 2064, *et seq.*  In addition, the claim for breach of express warranty was asserted expressly pursuant to Uniform Commercial Code ("UCC") § 2-313.  The implied warranty claim was bifurcated into separate claims for breach of the implied warranty of merchantability (UCC § 2-314) and breach of the implied warranty of fitness (UCC § 2-315).  In total, Plaintiffs asserted seventeen claims for relief, none of which included claims based upon personal injuries.  On June 5, 2009, the Court granted Defendants' motion to dismiss with leave to amend in part.  Leave to amend was limited expressly to Plaintiffs' claims based upon negligence, strict product liability, breach of express warranty, and violations of the MMWA and UCL.  The Court also granted Defendants' motion to strike Plaintiffs' purported class claims.  The Order stated clearly that Plaintiffs could "not add any new

2

1   defendants, plaintiffs or claims for relief without leave of the Court." Dkt. No. 59 at 29.

2       On July 6, 2009, Plaintiffs filed their second amended complaint ("SAC"), asserting

3   claims for negligence, strict product liability, breach of express warranty, and violations of the

4   MMWA and UCL.  The SAC also included a new claim under Florida's unfair competition

5   statute, and personal injuries were alleged as a basis for Plaintiffs' claims for negligence and

6   strict product liability.  On December 4, 2009, the Court granted Defendants' motion to dismiss

7   with limited leave to amend and struck Plaintiffs' class allegations and newly-asserted claims

8   based upon Plaintiffs' failure to seek leave of Court consistent with the June 5 Order.  Dkt. No.

9   70 at 25.  The Court again clearly informed Plaintiffs that they must seek leave of Court prior to

10  adding "any new defendants, plaintiffs or claims for relief."

11      On January 4, 2010, Plaintiffs filed the operative third amended complaint ("TAC"),

12  again asserting claims for negligence, strict product liability, breach of express warranty, and

13  violation of the MMWA and UCL.  On March 12, 2010, Defendants moved to dismiss the TAC

14  for failure to state a claim upon which relief may be granted and to strike all of the purported

15  class claims contained therein.  On the same date, Plaintiffs moved for leave to file their

16  proposed fourth amended complaint ("PFAC") which purports to refine all of their claims for

17  relief and adds class-wide and individual personal injury claims.

18      **B. General Allegations**

19      Select Comfort first began designing, manufacturing, distributing and selling Sleep

20  Number® beds in 1987.  TAC ¶ 29.  A limited twenty-year warranty accompanied each Sleep

21  Number® bed.  *Id.*  Plaintiffs allege that the Sleep Number® bed is defectively designed, causing

22  it to develop mildew and mold. *Id.* ¶¶ 38-43, 72.  They claim that the bed's frame supports one or

23  two air chambers, also known as bladders, that are separated and surrounded by foam pieces

24  known as inserts or toppers.  *Id.* ¶¶ 39, 40.  The inserts and toppers then are "enclosed by another

25  level of foam and a cover which completes the enclosure. . ." *Id.* ¶ 39.  The bladders are covered

26  with a canvas material that, along with the foam components, allegedly "absorb[s] moisture

27  which is never naturally ventilated due in part to the construction of the bladder which is a piece

28

3

of rubber or PVC sandwiched between two pieces of canvas." *Id.*  Plaintiffs allege that the bed's

design is "inherently defective" because it "is an air bladder surrounded by forma and an

upholstered topper" which "acts as a vapor barrier preventing the permeation of air or

ventilation." *Id.* ¶ 43.  Plaintiffs allege that the "air bladder thereby allows moisture from

condensation or other sources to become trapped within the system – a trait not shared by

upholstered products." *Id.*; *see also id.* ¶ 40 (alleging that "[u]pholstered products have the

ability for air to migrate throughout, thereby inhibiting the ability of the upholstered products to

retain a wet and damp state", while "[t]he Sleep Number bed, as designed, prevents air migration

in order to allow the user to adjust and maintain the exact air pressure desired...when moisture

comes into contact with the vapor barrier, through condensation or other means, it does not dry

as it would with ventilated upholstered products.  The moisture sits, stagnant, upon the vapor

barrier as designed and creates the perfect environment for mold incubation").  Plaintiffs claim

that Select Comfort has received thousands of complaints with respect to mold growth in its

Sleep Number® bed prior to and since 2004.  *Id.* ¶ 47.

Plaintiffs allege that in 2005, when Select Comfort made improvements to the Sleep

Number® bed, it applied mold inhibitors only to the "mattress covers." *Id.* ¶ 77.  This allegation

is contradicted directly by language found in Exhibit F (a Yahoo! Buzz article entitled, "The Real

Deal," posted on June 8, 2008), which Plaintiffs themselves attached as an exhibit to the FAC.

FAC Ex. F at 47.   In this article, Select Comfort represented publicly that, "All key components

of the Sleep Number® bed – including foam, air chambers, and fabrics – are treated with a

proprietary anti-microbial agent to deter the growth of mold, mildew, and bacteria." *Id.*

Select Comfort's limited warranty promises repair or replacement of a defective product

or component. TAC ¶ 34.  The language of the limited warranty indicates that repair or

replacement of the defective product or component is the "<u>exclusive remedy</u>, in lieu of all

incidental, special or consequential damages, including for negligence...Select Comfort will bear

no other damages or expenses." *Id.* (emphasis not in warranty, but added in TAC).  Plaintiffs

allege that Defendants are unable to repair the defect and that replacements of the defective

Case Number 08-2746 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTIONS TO STRIKE AND DISMISS, AND DENYING PLAINTIFFS'
MOTION FOR LEAVE TO FILE THEIR FOURTH AMENDED COMPLAINT
(JFLC1)

1   product only have led to replacement of one defective part with another defective part.  *Id.* ¶ 33.

2   While the limited warranty does not mention explicitly the availability of a full refund for

3   customers who have found mold in their beds, Select Comfort in fact has offered, in addition to

4   replacement components and replacement of the entire bed, a full refund at no charge to

5   complaining customers.  FAC, Ex. B at 17 (indicating in an online customer complaint board that

6   a customer who has an issue with mold is entitled to a full refund and providing the Select

7   Comfort Customer Care phone number).  However, Plaintiffs claim that Select Comfort

8   "selectively enforces the terms of the warranty and provides refunds to customers in a selective

9   manner and customarily only to those that complain and assert injury beyond the product itself

10  and in some cases not at all." TAC ¶ 34.

11           **C. Individual Allegations**[2]

12                 1. Molly Stearns

13           Stearns alleges that she purchased a Sleep Number® bed at BBB in 2000.  She claims

14  that she discovered mold in her bed on or around April 22, 2008, contacted Select Comfort

15  customer service that same day, and subsequently received a refund check from Select Comfort

16  for $1,894.35 without having requested a refund and without any explanation as to the amount

17  _____

18           [2] Plaintiffs object to Defendants' repeated assertions that Plaintiffs received refunds and
    replacement parts in response to complaints of mold in their mattresses.  Plaintiffs contend that
19  Defendants "inject the term 'refund' into this action as a red herring" and that Defendants'
    references to refunds are "hearsay and must be stricken."  Plaintiff's Objections at 3.  However,
20  Plaintiffs themselves, both in their prior pleadings and the TAC, allege that certain Plaintiffs
    received refunds and/or replacement parts. *See e.g.* FAC  ¶¶ 189, 91; SAC ¶¶ 54, 56, 57, 61, 63;
21  TAC ¶¶ 54, 51, 56, 64.  Factual assertions made in pleadings are considered admissions, *see*
    *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002), and Defendants may rely upon
22  Plaintiffs' admissions in asserting their legal arguments in support of the instant motion to
    dismiss and strike.  Accordingly, Plaintiffs' objections with respect to Defendants' references to
23  refunds are overruled.  Plaintiffs' other objections also relate to permissible legal arguments
24  asserted by Defendants, although the Court does not rely upon those arguments in the instant
    order.
25

26

27

28

                                                    5

provided. *Id.* ¶¶ 48, 64. The refund did not compensate Stearns for the "entire bed purchase price, the property damage she sustained or for costs associated with replacing the defective bed." *Id.* ¶ 64, *id.* ¶¶ 116, 143 (alleging that Stearns purchased replacement bedding totaling $282.26 and that the destroyed bedding cost significantly more than her replacement bedding). Stearns claims that she replaced her bedding based on her own "research that mold spores can become airborne and attach to other products in the immediate vicinity and at the urging of her doctor and a mold consultant whom she engaged." *Id.* Stearns purports to act as a California class representative with respect to all of Plaintiffs' claims. *Id.* ¶¶ 104-244.

### 2. Ruth Rose

Ruth Rose ("Rose"), a California resident, alleges that she bought a Sleep Number® bed in 1996, that she first found mold in her bed on or about May 23, 2008, and that she called Select Comfort to complain of mold in her bed on that same day. *Id.* ¶¶ 18, 49, 53. Rose was told that Select Comfort was aware of the mold problem but that it had changed the design in 2005 to address the problem. Plaintiffs claim that Select Comfort's assertion was false. *Id.* ¶ 53. Rose alleges that she offered Select Comfort the opportunity to cure the defect and that it refused when it "would not guarantee, under the terms of the warranty, that a design defect was not present and that post 2005 beds would not incubate mold." *Id.* ¶ 53. Select Comfort then provided Rose a full refund for her twelve-year-old bed, but it did not provide any additional compensation for the other property damage allegedly caused by the mold. *Id.* ¶¶ 54, 117, 144 (alleging that Rose spent $4,600.00 on replacement bedding including four sets of sheets; two goose down comforters; duvet covers; two bed skirts; pillow shams and four pillows). Like Stearns, Rose purports to act as a California class representative with respect to all of Plaintiffs' claims. *Id.* ¶¶ 90, 104-244.

### 3. Dennis and Bonnie Fuller

Dennis and Bonnie Fuller ("the Fullers"), residents of Florida, allege that they purchased

Case Number 08-2746 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTIONS TO STRIKE AND DISMISS, AND DENYING PLAINTIFFS'
MOTION FOR LEAVE TO FILE THEIR FOURTH AMENDED COMPLAINT
(JFLC1)

a Sleep Number® bed on May 17, 1996. *Id.* ¶ 19.  The Fullers first discovered mold in their bed on or about June 16, 2008 and contacted Select Comfort about the mold before the end of the year. *Id.* ¶¶ 50, 55 (alleging that "they were informed that Select Comfort was aware of the problem and made changes in the design in 2005 specifically in response to consumer complaints" and that "[t]his statement was untrue in that the design has never been changed"). The Fullers were provided a refund for their twelve-year-old bed, but they were not compensated for additional property damage they allegedly sustained or for the costs of replacing the defective products. *Id.* ¶¶ 56, 118, 145 (alleging that their replacement bedding cost approximately $400 to $500, but that the destroyed bedding was more expensive than the replacements at approximately $800-$1000); *id.* ¶¶ 119, 120, 146, 147 (alleging that the Fullers were forced to spend approximately $9,050.42 to replace their heating, ventilation, and air conditioning ("HVAC") to mitigate the effect of mold contamination caused directly by the Sleep Number® bed).  The Fullers allege that Dennis Fuller's primary care physician instructed that the HVAC and bedding should be replaced and that an environmental test commissioned by the Fullers on June 13, 2008 concluded that there was cladosporium mold in the HVAC system. *Id.* ¶¶ 120, 147.  The Fullers purport to act as Florida class representatives for all of Plaintiffs' claims. *Id.* ¶ 90.

        4. Dan Schlesinger

      Dan Schlesinger ("Schlesinger"), a California resident, alleges that he purchased a Sleep Number® bed on November 2, 1994. *Id.* ¶ 20.  Schlesinger's factual allegations in the TAC, like those in the SAC, are materially inconsistent with his allegations in the FAC.  In the FAC, Schlesinger alleged that he contacted Select Comfort in *2004* and that he received replacement parts before the antimicrobial reformulation conducted by Select Comfort in 2005.  FAC ¶ 189. Schlesinger claimed that these replacement parts subsequently developed mold and that when he reported this to Select Comfort, he was provided a full refund on his fourteen-year-old bed. *Id.*

Case Number 08-2746 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTIONS TO STRIKE AND DISMISS, AND DENYING PLAINTIFFS'
MOTION FOR LEAVE TO FILE THEIR FOURTH AMENDED COMPLAINT
(JFLC1)

1   The TAC alleges that Schlesinger contacted Select Comfort in *2003*, that Select Comfort

2   provided replacement parts on two different occasions, that both sets of replacements developed

3   mold,[3] and that Schlesinger *never* received his "requested refund and reimbursement for all

4   expenses and property damage he sustained related to the moldy bed." TAC ¶¶ 61, 62, 202, 235

5   (stating that he found mold again on August 11, 2008 or 2009[4], but failing to provide any

6   explanation for why the facts he alleged in the SAC and TAC directly contradict those he

7   asserted in the FAC despite the Court's expressed concern with respect to this contradiction in its

8   last order).  Schlesinger alleges that he spent approximately $300 to $400 on replacement

9   bedding, that he bought the destroyed bedding at about the same price, and that he purchased a

10  replacement mattress for $2,379.00.  *Id.* ¶¶ 121, 148 (alleging that Schlesinger replaced his

11  bedding after researching clorasporium mold).  Schlesinger purports to serve as a California class

12  representative for all of Plaintiffs' claims.  *Id.* ¶ 90.

13              5. Karen and Bryan Williams

14      Karen Williams, a California resident, alleges she purchased a Sleep Number® bed from

15  Sleep Train for her son, Bryan Williams, on February 10, 2004.  *Id.* ¶ 21.  Bryan Williams, a

16  California resident, was the user of the bed.  *Id.*  The Williamses allege that they first discovered

17  mold in the bed on October 26 and December 30, 2006 "while inspecting the bed for mold

18  growth as instructed by Select Comfort in their product manual and at the urging of [sic]

19  _____

20      [3] Schlesinger claims that he found mold for the second time on August 11, 2008 and
    engaged a mold expert on August 13, 2008.  TAC ¶ 202.  Schlesinger alleges that Select Comfort
21  refused him a refund but offered replacement parts.  *Id.*  These newly-alleged events occurred
    two months before Schlesinger filed the FAC in which he alleged that he received a refund.  FAC
22  ¶ 189.

23
    [4] In paragraph 202, Schlesinger alleges that he rediscovered mold in the replacement
24  parts on August 11, *2008,* while in paragraph 235, he alleges that he found the mold again in his
    bed on August 11, *2009*.  The Court presumes that this contradiction is a clerical error.  Because
25  Plaintiffs' opposition papers refer to the August 11, 2008 date, the Court will do so as well.

26

27

28
                                            8

1    toxicologist." *Id.* ¶ 52.  Karen Williams states that she contacted Select Comfort to complain

2    about mold in Bryan Williams' bed in 2006 and 2007 and that replacement parts were sent to

3    Bryan Williams.  *Id.* ¶ 57.  The Williamses allege that the new parts developed mold and that "K.

4    Williams also called and reported mold to Select Comfort and Sleep Train after the new parts

5    began to develop mold, mildew, and wetness." *Id.*  Defendants contend that this allegation is

6    demonstrably false based upon a recorded customer service call dated January 26, 2007, during

7    which Karen Williams requested a refund for Bryan Williams' bed but made no mention of

8    mold.  Dkt. No. 59 at 3-4 n. 2 (clarifying that the Court need not consider the substance of the

9    telephone call to decide the instant motion, but recognizing that in the call Karen Williams was

10   talking about moisture in the bed rather than mold).

11        On May 14, 2007, Karen Williams also sent a letter with return receipt requested to Lisa

12   Riedesel and Bill McLaughlin, the CEO of Select Comfort, complaining of the mold issues in her

13   son's bed, the outstanding "need for a recall notice to be sent out to all those with Sleep

14   Number® beds," and documenting several telephone calls to Select Comfort about the need for a

15   recall.  TAC ¶ 58, Ex. C.  However, while the letter reveals that the original bed developed mold,

16   it does not state that the replacement bed Defendants provided also had mold, but rather that the

17   "new bed pieces were completely soaking wet." *Id.,* Ex. C at 3-4 (contending that she was

18   instructed by a toxicologist to get the new bed out of the house and store it in plastic as it

19   "certainly appeared that the moisture problem that started the whole mold growing in the first

20   place had again started the process on the NEW BED!").

21        On May 29, 2007, Karen Williams received a phone call acknowledging receipt of her

22   letter by Select Comfort.  On June 1, 6, and 21, 2007, Select Comfort requested and received

23   documents from Karen Williams relating to property and personal injury damages related to her

24   son. *Id.* ¶ 58. On July 3, 2007, Select Comfort representative Lisa Riedesel contacted Karen

25   Williams by phone to "confirm whether she would remedy the property damage and injuries to

26

27

28

9

B. Williams and issue a recall or notification to the class." *Id.* ¶ 59.  Karen Williams alleges that her request for a refund and reimbursement of expenses totaling $32,000 was refused.  *Id.* ¶ 60. Finally, Karen Williams alleges that she spent approximately $500 on replacing the destroyed bedding that cost approximately the same amount.  *Id.* ¶ 149.

In response to customer complaints, Select Comfort redesigned the Sleep Number® bed in 2005 to inhibit mold growth.  *Id.* ¶ 77 (alleging that "only the mattress cover received an inhibitor to prevent users from knowing that their bed was contaminated....[and that] this inhibitor in no way addressed the millions of beds already in service and the defective design which is the root cause of the mold).  Plaintiffs allege that Defendants thus were on notice of the defect in the beds.  *Id.*  Plaintiffs claim that Select Comfort nonetheless continued to distribute defective replacement beds and parts to consumers who had mold in their older beds.  *Id.* ¶¶ 66, 67.  Moreover, when Select Comfort learned of the defect that caused the mold growth, Defendants allegedly did not provide notice to the public or any warning to Plaintiffs of the defect.  *Id.* ¶¶ 68-70.  Plaintiffs assert that putative class members and the named Plaintiffs have "obtained replacement parts since the 2005 reformulation and the results are identical-mold incubation in the internal components."  *Id.* ¶ 80.  Plaintiffs allege specifically that "Schlesinger, Rose, and Williams have each told Select Comfort that mold growth has occurred in their beds since the 2005 reformulation," but that Select Comfort continues to claim that "there have been 0 confirmed cases of mold in a Sleep Number® bed sold after the antimicrobial reformulation in 2005."  *Id.*

Each named plaintiff claims to have discovered mold in his or her respective Sleep Number® bed and to have removed or replaced his or her defective bed.  *Id.* ¶ 84.  Each claims to have expended money to purchase replacement bedding, including sheets, pillows, comforters, and blankets ("replacement bedding").  *Id.*  Plaintiffs claim that the cost of their replacement bedding has not been compensated.  In addition, all Plaintiffs allege that they suffered damages in the form of shipping and handling costs of "either replacement products or mold infected products that they would not otherwise have spent were it not for defendants' defective product."

Case Number 08-2746 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTIONS TO STRIKE AND DISMISS, AND DENYING PLAINTIFFS'
MOTION FOR LEAVE TO FILE THEIR FOURTH AMENDED COMPLAINT
(JFLC1)

*Id.* ¶ 86.  Finally, for the first time, Plaintiffs allege that the *design defect* that causes mold

growth in the mattresses is outside the terms of the express limited warranty, which covers

"defects in material and workmanship" *Id.* ¶¶ 67, 73, 161 (stating that "this warranty does not

expressly address any remedy or limitation for design defects.  As such, it does not apply to any

claim based on a defectively designed product, but only to the defective materials and

workmanship associated with the component parts of the product").  Plaintiffs do recognize that

the limited warranty also states that, "[t]he purchaser's exclusive remedy...is limited to repair and

replacement of any produce [sic] or component deemed to be defective..." *Id.* ¶ 175.

## II.  MOTIONS TO DISMISS AND STRIKE

### A. Legal Standard

#### 1. Motion to dismiss

"Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a

cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v.*

*Centinela Hosp. Med. Ctr.,* 521 F.3d 1097, 1104 (9th Cir. 2008) (citation omitted).  For purposes

of a motion to dismiss, the plaintiff's allegations are taken as true, and the court must construe the

complaint in the light most favorable to the plaintiff.  *Jenkins v. McKeithen*, 395 U.S. 411, 421,

89 S.Ct. 1843, 23 L.Ed.2d 404 (1969).  "To survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'  A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), citing *Bell Atl. Corp. v.*

*Twombly,* 550 U.S. 544, 556, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  Thus, a court need

not accept as true conclusory allegations, unreasonable inferences, legal characterizations, or

unwarranted deductions of fact contained in the complaint.  *Clegg v. Cult Awareness Network*,

18 F.3d 752, 754-755 (9th Cir. 1994).  Leave to amend must be granted unless it is clear that the

complaint's deficiencies cannot be cured by amendment.  *Lucas v. Dep't of Corr.*, 66 F.3d 245,

248 (9th Cir. 1995).  When amendment would be futile, however, dismissal may be ordered with

Case Number 08-2746 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTIONS TO STRIKE AND DISMISS, AND DENYING PLAINTIFFS'
MOTION FOR LEAVE TO FILE THEIR FOURTH AMENDED COMPLAINT
(JFLC1)

1  prejudice.  *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

2       On a motion to dismiss, the Court's review is limited to the face of the complaint and

3  matters judicially noticeable.  *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.

4  1986)*; N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  However, under

5  the "incorporation by reference" doctrine, the Court also may consider documents which are

6  referenced extensively in the complaint and which are accepted by all parties as authentic.

7  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

8              **2. Motion to strike**

9       Pursuant to Federal Rule of Civil Procedure 12(f), the court may "strike from a pleading

10  an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Where

11  the damages sought in a prayer for relief are not recoverable as a matter of law, a motion to strike

12  may be used to strike the prayer for such damages.  *Wilkerson v. Butler*, 229 F.R.D. 166, 172

13  (E.D. Cal. 2005); *Bureerong v. Uvamas*, 922 F. Supp. 1450, 1479, n.34 (C.D. Cal. 1996), citing

14  *Tapley v. Lockwood Green Engineers, Inc.,* 502 F.2d 559, 560 (8th Cir. 1974).

15       The grounds for a motion to strike must appear on the face of the complaint or from

16  matter which the court may judicially notice and the court must view the pleading in the light

17  most favorable to the pleader.  *SEC v. Sands,* 902 F. Supp. 1149, 1165 (C.D. Cal. 1995); *Lazar v.*

18  *Trans Union LLC,* 195 F.R.D. 665, 669 (C.D. Cal. 2000), citing *California v. United States,* 512

19  F.Supp. 36, 39 (N.D. Cal. 1981).  The central function of a Rule 12(f) motion is "to avoid the

20  expenditure of time and money that must arise from litigating spurious issues by dispensing with

21  those issues prior to trial." *Sidney-Vinstein v. A.H. Robins Co.,* 697 F.2d 880, 885 (9th Cir. 1983).

22  As with motions to dismiss, when ruling on a motion to strike, the Court takes the plaintiff's

23  allegations as true and must liberally construe the complaint in the light most favorable to the

24  plaintiff. *Farm Credit Bank of Spokane v. Parsons,* 758 F.Supp. 1368, 1371 n. 4 (D.Mont.1990)

25  (citing 2A Moore's Federal Practice ¶ 12.21[3] ).  Leave to amend must be granted unless it is

26  clear that the complaint's deficiencies cannot be cured by amendment. *See Lucas,* 66 F.3d at 248.

27

28

Case Number 08-2746 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTIONS TO STRIKE AND DISMISS, AND DENYING PLAINTIFFS'
MOTION FOR LEAVE TO FILE THEIR FOURTH AMENDED COMPLAINT
(JFLC1)

1

   **B. Discussion[5]**

2

   **1. Legally Cognizable Injury**

3

   Plaintiffs cannot maintain a claim without properly alleging a legally cognizable injury.

4 *Khan v. Shiley, Inc.*, 266 Cal.Rptr. 106, 110 (Cal. Ct. App. 1990) (holding that a product liability

5 claim necessitates the allegation of a legally cognizable injury); *County of Santa Clara v. Atl.*

6 *Richfield Co.*, 40 Cal.Rptr. 3d 313, 318 (Cal. Ct. App. 2006) (concluding that a plaintiff must

7 allege a legally cognizable injury to state a negligence claim); *Williams v. Beechnut Nutrition*

8 *Corp.*, 229 Cal.Rptr. 605, 608 (1986) (holding that to state a prima facie case for breach of

9 express warranty a plaintiff must allege that the breach of warranty proximately caused an

10 injury); Cal. Bus. & Prof. Code §§ 17204, 17535 (identifying an "injury in fact" as a necessary

11 element of a UCL claim).

12

   Defendants contend that all of Plaintiffs' claims for relief are insufficient because no

13 legally cognizable injuries have been pled.  First, Defendants assert that the Court has determined

14 that the limited warranty bars all of Plaintiffs' claims for incidental and consequential damages

15 (i.e., replacement bedding, shipping and handling), leaving only claims based upon the bed itself.

16 Defendants argue that because either replacement parts or full refunds already have been

17 provided to each Plaintiff, Plaintiffs have no damages.  However, as addressed below, *see infra*

18 III.B., the Williamses allege that their replacement bed's inner parts were soaking wet and that

19 they never were provided a refund or non-defective replacement for this second mattress.  In

20 addition, as addressed below, Plaintiffs now contend for the first time that the alleged design

21

22

   [5] Plaintiffs contend incorrectly that Defendants' reliance upon this Court's prior orders
and analysis of allegations pled in earlier complaints is improper in the context of the instant

23 motions to dismiss and strike.  "The law of the case doctrine is a discretionary one created to
maintain consistency and avoid reconsideration, during the course of a single continuing lawsuit,

24 of those decisions that are intended to put a matter to rest."  *Pit River Home & Agric. Coop.*
*Ass'n v. U.S.*, 30 F.3d 1088, 1097 (9th Cir. 1994).  "Under the doctrine, a court is generally

25 precluded from reconsidering an issue previously decided by the same court, or a higher court in

26 the identical case."  *Milgard Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703, 715 (9th
Cir. 1990).  Accordingly, Defendants' citation of and this Court's own reliance upon its

27 conclusions in prior orders is proper.  Whether Defendants' characterization of the prior orders is
accurate remains an issue for the Court's determination.

28

13

1   defect that causes mold growth and incubation lies outside of the limited warranty.  Accordingly,

2   Plaintiffs contend that their damages are not barred by the contract's language excluding

3   incidental and consequential damages.

4       Second, Defendants argue that Plaintiffs' negligence and strict product liability claims are

5   insufficient because the economic loss doctrine bars damages based on the beds themselves,

6   replacement parts, or related shipping and handling charges.  *Robinson Helicopter Co., Inc. v.*

7   *Dana Corp.*, 34 Cal.4th 979, 988 (2004) (citations omitted) (concluding that when "a purchaser's

8   expectations in a sale are frustrated because the product he bought is not working properly, his

9   remedy is said to be contract alone, for he has suffered only 'economic' losses.").  Plaintiffs

10  claim that they have alleged harm beyond a broken contractual promise because they suffered

11  property damage to replacement bedding and because the Fullers in particular were forced to

12  replace their HVAC system.

13      In its last order, the Court determined that these same allegations were insufficient to

14  create a cognizable injury because Plaintiffs failed to plead how the alleged design defect in the

15  mattresses caused them to make these replacements or what the bedding replacements cost.

16  Plaintiffs have addressed the latter concern in the TAC by alleging the cost of replacement

17  bedding and the HVAC system.  TAC ¶¶ 143-150 (alleging that Plaintiffs' replacement bedding

18  ranged from $282.26 to $4,600.00, while the Fullers paid $9,050.42 to replace their HVAC

19  system).  The Court noted that *de minimus* damage claims in cases of this kind have been

20  rejected by courts both in California and elsewhere.  *County of Santa Clara v. Atl. Richfield*, 40

21  Cal. Rptr. 3d 313, 335-36 (Cal. App. Ct. 2006); *Theideman v. Mercedes-Benz USA, LLC,* 872

22  A.2d 783, 795 (N.J. 2005); *Frank v. Daimler Chrysler Corp.*, 292 A.D.2d 118, 120, 127 (N.Y.

23  2002).  Plaintiffs' alleged costs of replacement bedding are not *de minimus*, and Defendants do

24  not appear to contend otherwise.[6]

25

26

27      [6]  The Court concluded in its last order and reaffirms its conclusion that the costs of
    shipping and handling for the beds and replacement parts relate to the product itself and thus are
28  subject to the economic loss rule.  Dkt. No. at 18.

14

1  However, Plaintiffs still fail to plead a causal link between the mold found in the

2  mattresses and the need to replacement their bedding and the Fullers' HVAC system.  Not one

3  named Plaintiff alleges finding mold on his or her bedding, and while the Fullers allege that mold

4  was found in the HVAC system, they do not allege that the mattress caused this mold or how it

5  did so.  TAC ¶¶ 116, 118, 120, 121, 122, 143, 147, 148, 149 (individual plaintiffs alleging that

6  their doctor or a mold expert urged them to replace their bedding or that their own research

7  informed them that mold spores can become airborne, but not claiming that the bedding actually

8  had become infected with mold or that it could not be cured by being cleaned).  Moreover, even

9  if Plaintiffs had alleged causation sufficiently, it appears, as discussed below, *see infra* II.B.2,

10  that recovery of mold-related damages is prohibited under the Limited Warranty.  Accordingly,

11  the Court again concludes that Plaintiffs have failed to allege damages beyond those covered by

12  the economic loss rule.

13  Third, Defendants contend that the TAC contains no allegations of a cognizable injury

14  under the UCL.  While the UCL does not permit recovery of damages as such, a plaintiff may

15  obtain injunctive relief and/or restitution.  Defendants assert that all Plaintiffs have

16  acknowledged receiving a refund, excepting the contradictory allegations of Schlesinger and

17  Karen and Bryan Williams.  However, as discussed below, the Williamses' allegations are not

18  contradictory.  Defendants argue that although the Williamses received a replacement bed, there

19  is no allegation that this replacement bed developed mold.  While the Williamses' allegations of

20  *mold* in the replacement bed are not supported by Karen Williams' complaint letter, *see* TAC,

21  Ex. C, this communication does state explicitly that the replacement bed's inner parts were

22  *soaking wet.*  Accordingly, Karen Williams may be entitled to restitution or injunctive relief in

23  the form of a non-defective replacement mattress.  However, the damages alleged by the

24  remaining Plaintiffs, i.e., having to purchase replacement bedding and incurring shipping and

25  handling costs, do not appear to be recoverable pursuant to the limited warranty.

26

27

28

15

## 2. Warranty Claims[7]

Plaintiffs' breach of express warranty and MMWA claims are brought on behalf of a purported class represented by each of the named plaintiffs.  An explicit promise by the seller with respect to the quality of goods that is part of the bargain between the parties creates an express warranty "that the goods shall conform to the affirmation or promise."  UCC § 2-313. To plead a claim for breach of express warranty, the buyer must allege that the seller "(1) made an affirmation of fact or promise or provided a description of its goods; (2) the promise or description formed part of the basis of the bargain; (3) the express warranty was breached; and (4) the breach caused injury to the plaintiff."  *Blennis v. Hewlett-Packard Co.*, No. C 07-00333, 2008 WL 818526, at *2 (N.D. Cal. Mar. 25, 2008)  (citation omitted).  Such a claim must describe the exact terms of the warranty, allege that the buyer reasonably relied on those terms, and that the breach of the warranty was the proximate cause of the buyer's injury.  *See id.*  A buyer also must plead that notice of the alleged breach was provided to the seller within a reasonable time after discovery of the breach.  UCC § 2-607(3)(a); *see also Pollard v. Saxe & Yolles Dev. Co.*, 12 Cal.3d 374, 380 (1974) ("The requirement of notice of breach is…designed to allow the defendant opportunity for repairing the defective item, reducing damages, avoiding defective products in the future, and negotiating settlements.").  The buyer has the burden of showing that reasonable notice was provided.  *Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*, 169 Cal. App. 4th 116, 135 (2008).[8]

---

[7]  Because the MMWA provides a federal remedy for state warranty claims, *Monticello v. Winnebago Indus. Inc.*, 369 F. Supp. 2d 1350, 1356 (N.D. Ga. 2005), but does not expand the rights available under such warranties, the Court analyzes the state law and MMWA claims simultaneously.  *See id.; see also Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) ("disposition of the state law warranty claims determines the disposition of the Magnusson-Moss Act claims."); *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 833 (2006) ("the trial court correctly concluded that failure to state a warranty claim under state law necessarily constituted a failure to state a claim under Magnusson-Moss.")

[8]  Timely notice of breach is not required where the buyers did not purchase the product from the manufacturer directly.  *See Sanders v. Apple Inc.*, 672 F.Supp.2d 978, 989 (N.D. Cal. 2009), citing *Greenman v. Yuba Power Prods.*, 59 Cal.2d 57, 61 (1963).  The TAC alleges that

16

1

### a. Pre-Suit Notice

2        A buyer must plead that notice of the alleged breach was provided to the seller within a

3  reasonable time after discovery of the breach.  UCC § 2-607(3)(a); *see Pollard,* 12 Cal.3d at 380.

4  Defendants contend that Plaintiffs' express warranty and MMWA claims must be dismissed

5  because they failed to provide notice either of the original defect or that the attempted repair,

6  replacement or refund was inadequate.

7        Defendants contend that Stearns alleges no new facts demonstrating that she provided

8  pre-suit notice of her warranty claim.  However, Stearns does allege that she contacted Select

9  Comfort on April 22, 2008 to complain about mold in her bed.  TAC ¶¶ 63, 64 (alleging that the

10  Customer Service Representative told her that she would be receiving a refund and despite her

11  refusal Stearns received a refund check for $1,894.35).  Stearns filed the instant action in state

12  court three days after placing this call to Select Comfort's customer service.  Accordingly, the

13  Court concludes that Stearns has alleged adequate pre-suit notice.[9]

14        Defendants next argue that Plaintiffs fail to plead that the Williamses provided proper

15  pre-suit notice of the mold in their replacement bed.  Karen Williams first notified Defendants of

16  the mold in her son's bed in 2006, and she did so again on May 14, 2007.  *Id.* ¶¶ 57, 58.  Select

17  Comfort sent a new bed to Bryan Williams.  Plaintiffs allege that this new bed then developed

18  mold.  *Id.* ¶ 57.  The TAC does not allege when the Williamses called or contacted Defendants

19  regarding the mold that developed in the replacement bed.  Exhibit C to the TAC is a letter that

20  Karen Williams sent to Select Comfort representative Lisa Riedesel on May 14, 2007.  TAC, Ex.

21  C.  While the letter details the discovery of mold in Bryan Williams' first bed and the health

22  problems Bryan Williams allegedly suffered, it does not assert that the replacement bed itself

23

24  three of the named Plaintiffs purchased their Sleep Number® beds directly from Select Comfort.
    TAC ¶¶ 18-20.  The remaining named Plaintiffs purchased their beds through Sleep Train and

25  BBB, both retailers.  *Id*. ¶ 21.

26

27        [9]  Defendants do not attack the sufficiency of the pre-suit notice or contend that a three-

28  day period was inadequate time for them to respond appropriately.

17

1    developed *mold.*  Rather, it asserts that when the new replacement bed arrived, the Williamses

2    "unzipped the bed to open it up and show the interior makings of the bed and to [their] worst

3    fear, the new bed pieces were completely soaking wet!!! Immediately [they] were instructed to

4    get the bed out of the house again storing it in plastic.  So goes the story...it certainly appeared

5    that the moisture problem that started the whole mold growing in the first place had again started

6    the process on the NEW BED!!"  *Id.* at 3-4.  While Plaintiffs now plead clearly that Karen

7    Williams contacted Defendants about problems with the replacement bed prior to filing the

8    instant action, the notice itself mentions moisture, not mold.  That said, it appears that the Karen

9    Williams provided sufficient notice "to let the seller know that the transaction [was] still

10   troublesome and must be watched" even if the word *mold* was not used specifically. *See* UCC §

11   2-607 Official Comment 4.

12       While the parties dispute whether Defendants responded adequately to such notice,

13   Defendants do not argue that the remaining named Plaintiffs do not plead pre-suit notice

14   adequately.  However, Defendants do contend that Plaintiffs have not pled adequate notice to

15   Select Comfort that they were acting *on behalf of a plaintiff class* prior to filing suit.  The

16   MMWA provides that no private action may be brought unless the defendant first is afforded a

17   reasonable opportunity to cure its failure to comply, and in the case of a purported class action,

18   "such reasonable opportunity will be afforded by the named plaintiffs and they shall at that time

19   notify the defendant they are acting on behalf of the class." 15 U.S.C. § 2310(e).

20       Plaintiffs contend that Karen Williams's letter served as proper pre-suit notice on behalf

21   of the class.  The letter addresses in detail the mold found in Bryan Williams' mattress, describes

22   the health problems that he and his girlfriend suffered that purportedly stemmed from the mold,

23   expresses outrage at the moisture found in the replacement bed provided by Defendants, and

24   finally requests that Select Comfort reimburse Williams for expenses totaling $32,000.  TAC,

25   Ex. C.  However, nothing in the letter states or even implies that Williams is acting on behalf of a

26   purported plaintiff class.  *Id.* (inquiring how "without a recall notice. . .WE the consumers [are]

27   supposed to know" of the mold problems, but never indicating that she was acting on behalf of a

28

18

class and specifically requesting reimbursement totaling $32,000 based upon her personal expenses including medical bills).  The Court agrees with Defendants that Plaintiffs' allegations of pre-suit notice on behalf of the purported class are inadequate.

### b.  Select Comfort's Limited Warranty

#### 1. Breach

"A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 525, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).  The express warranty at issue here provided that Sleep Number® beds would be "free from defects in materials and workmanship for a period of 20 years from the original purchase date" and that the "warranty is limited to product repair or replacement only."  FAC, Ex. G.  In its order dated June 5, 2009, the Court held that because Defendants offered repair or replacement goods, and when that remedy proved unsatisfactory provided full refunds to all named Plaintiffs, the buyer was provided with the "substantial value of the bargain" and thus suffered no cognizable injury.  Order at 8-10; *See* UCC § 2-719 Official Comment 1; *see also Marr Enters., Inc. v. Lewis Refrigeration Co.*, 556 F.2d 951, 955 (9th Cir. 1977) ("If the seller did not replace the defective parts, the purchaser was entitled to refund of the purchase price...mere failure to replace or repair would not cause the court to read in the general remedy provisions of the UCC [due to failure of essential purpose]").  Moreover, the Court previously has concluded that when the named Plaintiffs accepted the refund, they essentially modified the terms of the express warranty and the remedies available for breach.  *See* UCC § 2-719 Official Comment 1 ("parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect.")

In its order dated December 4, 2009, the Court noted that Plaintiffs Schlesinger and Karen Williams had alleged for the first time in the SAC that their request for a refund was refused.  Dkt. No. 70 at 13-14.  While the FAC was silent as to whether Karen Williams received a refund, it stated explicitly that Schlesinger in fact did receive a refund from Select Comfort when he complained about mold.  Plaintiffs offered no explanation for this directly contradictory

statement of material fact as to Schlesinger or newly-alleged fact as to Karen Williams.  In the

TAC, Schlesinger and Karen Williams again allege that their request for a refund was refused

and again fail to provide any explanation for the contradiction in their prior pleadings.  TAC ¶ 60

(alleging that Karen Williams "requested in writing a refund and reimbursement for all expenses

related to the moldy bed, an amount which equaled approximately $32,000.00" and that this was

rejected); *id.* ¶ 62 (stating that "Schlesinger requested a refund and reimbursement for all

expenses and property damage he sustained related to the moldy bed" and that the "demand went

unanswered").

        In light of these contradictions, Defendants contend that the Court need not accept these

allegations as true.  MTS&D at 6, citing *See Azadpour v. Sun Microsys., Inc.*, No. 06-3272,

2007 WL 2141079, at *2 n. 2 (N.D. Cal. July 23, 2007) ("Where allegations in an amended

complaint contradict those in a prior complaint, a district court need not accept the new alleged

facts as true, and may, in fact, strike the changed allegations as "false and sham."), citing Hon.

William W. Schwarzer, et al., Federal Civil Procedure Before Trial, § 9:223.5 (2006), citing

*Bradley v. Chiron Corp.,* 136 F.3d 1317, 1324 (9th Cir. 1998) (A trial judge has the authority to

strike pleadings that are "false and sham"); *Ellingson v. Burlington Northern, Inc.,* 653 F.2d

1327, 1329-30 (9th Cir. 1981) (Based on FRCP Rule 11); *see also Jones v. Bayer Healthcare

LLC*, No. 08-2219 SC, 2009 WL 1186891, at *3 (N.D. Cal. May 4, 2009) (striking plaintiff's

amended pleading because it was factually inconsistent with plaintiff's previous complaint); *see

also Stonebrae, L.P. v. Toll Bros., Inc.,* NO. C-08-0221 EMC, 2010 WL 114010, at *8 (N.D. Cal.

Jan. 7, 2010) (holding that where allegations in an amended complaint contradict those in a prior

complaint the district court need not accept the new alleged facts as true, but that when a party

explains the error in a subsequent pleading or by amendment, the trial court must accord the

explanation due weight), citing *Sicor Ltd. v. Cetus Corp.,* 51 F.3d 848, 859-60 (9th Cir. 1995);

*seek also Jones v. Bayer Healthcare LLC*, No. 08-2219 SC, 2009 WL 1186891, at *3 (N.D. Cal.

May 4, 2009).

        In both cases, Select Comfort's failure to provide a refund or repair the mold found in

Case Number 08-2746 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTIONS TO STRIKE AND DISMISS, AND DENYING PLAINTIFFS'
MOTION FOR LEAVE TO FILE THEIR FOURTH AMENDED COMPLAINT
(JFLC1)

1   the customers' beds would constitute a potential breach of the warranty if proper notice and an

2   opportunity to cure were provided.  Because Karen Williams' allegation that she did not receive a

3   refund for her defective *replacement* bed (or a second *non-defective* replacement) does not

4   contradict a previous pleading, the Court will accept it as true.  However, the Court will not

5   accept Schlesinger's allegation that he did not receive a refund given Plaintiffs' past

6   contradictory pleadings and repeated failure to provide an explanation despite the Court's

7   express concern in its prior order.  Dkt. No. 70 at 13 ("Plaintiffs offer no explanation for this

8   directly contradictory statement of a material fact as to Schlesinger or newly-alleged fact as to

9   Williams").[10]

10                              **2. Special or Consequential Damages**

11       The express warranty excludes recovery for "special or consequential damages."  FAC,

12  Ex. G.  The enforceability of such an exclusion is addressed in the California Commercial Code,

13  which provides in pertinent part that:

14          Consequential damages may be limited or excluded unless the limitation
            or exclusion is unconscionable.  Limitation of consequential damages for injury to
15          the person in the case of consumer goods is invalid unless it is proved that the
            limitation is not unconscionable.  Limitation of consequential damages where the
16          loss is commercial is valid unless it is proved that the limitation is
            unconscionable.

17  Cal. Com. Code § 2719(3).

18

19

---

20       [10]  Defendants assert that they do not address Schlesinger's breach of warranty claim in
    their motion to dismiss because the Court previously found that it was barred by the statute of
21  limitations.  Cal. Com. Code § 2725 (setting a four-year limitations period for warranty claims);
    SAC ¶ 53 (alleging that Schlesinger discovered the mold in his bed in 2003, well outside the
22  four-year limitations period).  However, in the TAC, Schlesinger alleges that he found mold
    again on August 11, 2008.  If Plaintiffs were able to explain their contradictory pleadings, a
23  claim premised upon the date of rediscovery would not fall outside of the four year statute of
    limitations.
24
         Finally, Stearns alleges for the first time that the refund she received ($1,894.25) did not
25  compensate her for "the entire bed purchase price, the property damages she sustained or for
    costs associated with replacing the defective bed."  TAC ¶ 64.  Stearns does not distinguish
26  between the bed purchase price and other costs (e.g., replacement bedding and shipping and
    handling costs) sufficiently to put Defendants on notice or make clear to the Court whether the
27  sum of $1,894.25 compensated her fully for the original purchase price of the bed.
28

21

1    In its last order, the Court concluded that the limited warranty is not procedurally or

2    substantively unconscionable. Dkt. No. 70 at 14-16 (holding that providing a refund, even

3    though it is not mentioned as a remedy within the limited warranty, is consistent with California

4    public policy as expressed in the Song-Beverly Consumer Warranty Act), citing *See* Cal.

5    Com.Code § 1793.2(d)(1) ("[I]f the manufacturer or its representative in this state does not

6    service or repair the goods to conform to the applicable express warranties after a reasonable

7    number of attempts, the manufacturer shall either replace the goods or reimburse the buyer in an

8    amount equal to the purchase price paid by the buyer, less that amount directly attributable to sue

9    by the buyer prior to the discovery of the nonconformity"). Plaintiffs do not reassert their

10   previous unconscionability argument in their opposition to the instant motion.[11]

11   Instead, Plaintiffs now argue that because the parties modified the terms of the warranty

12   by substituting refunds for repair or replacement parts, Plaintiffs should be able to modify the

13   terms of the warranty to include recovery of consequential and incidental damages. However, a

14   modification to a warranty or contract requires proof of mutual assent. *See Comerica Bank v.*

15   *Whitehall Specialties, Inc.*, 352 F.Supp.2d 1077, 1081 (C.D. Cal. 2004), citing *PMC, Inc. v.*

16   *Porthole Yachts,* Ltd., 65 Cal.App.4th 882, 887, 76 Cal.Rptr.2d 832, 834 (1998). ("[a] valid

17   modification...requires proof of...mutual assent.") Defendants do not assent to modifying the

18   limited warranty to provide Plaintiffs with a right to incidental or consequential damages.

19   Finally, Plaintiffs argue that Defendants made a misrepresentation in offering the

20   warranty and that in turn Plaintiffs now can "back[] out of the deal." Opp. Mot. 17-18, citing

21   *Western Filter Corp. v. Argan, Inc.*, 540 F.3d 947, 952 (2008) ("If, prior to closing, either the

22   seller or buyer discovers that a representation or warranty made by the other party is not true,

23   they have grounds for backing out of the deal.") This argument is perplexing. Plaintiffs appear

24   to assert that they can "back out" of the warranty while at the same time alleging that they are

25   entitled to damages for breach. For this reason, and because Plaintiffs do not explain how

26

27   [11] As discussed above, *see supra* II.B.1, Plaintiffs also fail to allege the causal connection
     between the alleged mold within the mattress and the need to replace their bedding and the
28   Fullers' HVAC system.

Case Number 08-2746 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTIONS TO STRIKE AND DISMISS, AND DENYING PLAINTIFFS'
MOTION FOR LEAVE TO FILE THEIR FOURTH AMENDED COMPLAINT
(JFLC1)

1   Defendants misrepresented the warranty, the Court concludes that the warranty limits Plaintiffs'

2   entitlement to consequential and incidental damages.[12]

3                      **3. Negligence and Strict Products Liability**

4        "In order to establish negligence under California law, a plaintiff must establish four

5   required elements: (1) duty; (2) breach; (3) causation; and (4) damages." *Ileto v. Glock Inc.*, 349

6   F.3d 1191, 1203 (9th Cir. 2003) (citation omitted).  To prevail on a strict products liability claim,

7   a plaintiff must show that a "manufacturer is or should have been aware that a product is

8   unreasonably dangerous absent a warning and such warning is feasible, the manufacturer will be

9   held strictly liable if it fails to give an appropriate and conspicuous warning." *Maneely v.*

10  *General Motors Corp.*, 108 F.3d 1176, 1179 (9th Cir. 1997), citing *Burke v. Almaden Vineyards,*

11  *Inc.,* 86 Cal.App.3d 768, 772, 150 Cal.Rptr. 419 (1978).  "[R]ecovery under the doctrine of strict

12  liability is limited solely to 'physical harm to person or property." *Jimenez v. Super. Ct.*, 29

13  Cal.4th 473, 482 (Cal. 2002), quoting *Seely v. White Motor Co.*, 63 Cal.2d 9, 18 (1965).

14                           **a. Economic Loss Doctrine**

15       As discussed above, Plaintiffs' allegations of loss and causation are insufficient.  *See*

16  *supra* II.B.1 (concluding that the Fullers[13] fail to plead how the alleged mold in their mattresses

17  caused the development of mold in their HVAC system and that the remaining Plaintiffs failed to

18  plead that their former bedding had mold on it or why mold contained within their mattresses

19  forced Plaintiffs to replace their bedding).  Moreover, incidental and consequential damages are

20  precluded under the terms of the Limited Warranty and, as discussed above, *see supra* II.B.2.b.2,

21  Plaintiffs do not argue in their opposition papers that this limitation is unconscionable.

22  ─────────────────

23      [12]  Plaintiffs attempt to state a claim under California Civil Code § 1793.2(a) in their
24  opposition papers.  However, Plaintiffs do not allege a claim for relief under § 1793.2 within the
    TAC, and they have not sought leave of Court to allege a new claim.

25      [13]  Even if the Fullers' had a valid negligence claim for property damage notwithstanding
26  the economic loss rule, Defendants argue that this Court has no interest in a dispute between the
    Fullers, who are residents of Florida, and Select Comfort Retail Corporation, a Minnesota
27  corporation.  28 U.S.C. § 1391(a).  The Fullers' claims with respect to their HVAC system also
28  are unique and inappropriate for class treatment.

23

**b. Unreasonably dangerous product**

Plaintiffs claim that the mold-inducing defect renders the mattresses an unreasonably

dangerous product.  They contend that the bed is designed to incubate mold – a condition which

normally does not occur in beds used in their customary manner – and that the mold creates

extreme danger to Plaintiffs and others similarly situated.  Opp. at 16, citing TAC ¶¶ 77, 108,

135, 216, 219, 224, 231.  Plaintiffs argue that this problem "is magnified by the fact that a simple

straight forward instruction on notice would allow a customer/user to look inside the bed and see

if mold actually exists."  Opp. at 16.  However, Plaintiffs' factual allegations relate almost

entirely to Select Comfort's 2005 reformulation of a new mold-inhibiting agent and the fact that

Select Comfort has not notified customers of the alleged defect.  Plaintiffs' remaining allegations

state in a conclusory fashion that the mattress was a "defective, contaminated, and dangerous

product, and unsafe for the use and purpose for which it was intended when used and applied as

recommended by defendants."  TAC ¶ 108.  Such allegations do not meet the pleading standard

of Fed. R. Civ. P. 8 and need not be accepted as true.  *Clegg,* 18 F.3d at 754-755.

**c. Design Defect**

Plaintiffs allege for the first time that the mold in their mattresses was caused by a *design*

defect and that the Limited Warranty does not extend to *design* defects.  Based on these

allegations, Plaintiffs argue that they can avoid the limitations of the warranty, including its bar

on recovery for incidental and consequential damages.  The Limited Warranty states:

> Select Comfort Corporation ("Select Comfort") warrants to the original purchaser
> that their Select Comfort sleep system (mattress and/or foundation) will be free
> from *defects in material and workmanship* for a period of twenty years from the
> original purchase date.

FAC Ex. A (Limited Warranty) at 18 of 56. (emphasis added).

"When interpreting a contract, the plain language within the four corners of the contract

must first be examined to determine the mutual intent of the contracting parties.  *United States v.*

*Wetlands Water Dist.*, 134 F.Supp.2d 1111, 1134 (E.D. Cal. 2001).  "A written contract must be

read as a whole and every part interpreted with reference to the whole, with preference given to

reasonable interpretations."  *Id.* at 1135, quoting *Klamath Water Users Protective Ass'n v.*

*Patterson,* 204 F.3d 1206, 1210 (9th Cir. 1999), *cert. denied,* 531 U.S. 812, 121 S.Ct. 44, 148 L.Ed.2d 14 (2000) (citation omitted).   Plaintiffs argue that the Limited Warranty's coverage of "defects in material and workmanship" does not extend to defects in design.  However, despite their conclusory assertion as to the meaning of the contract, Plaintiffs do not cite legal authority for their proposed construction.

Defendants argue persuasively that the term "workmanship" is broad and includes the quality and skill that is part of the design process for the bed.  Reply at 8, citing *Koulajain v. Trek Bicycle Corp.*, No. 90-Civ-3156(LJF), 1992 WL 28884, at *2 (S.D.N.Y. Feb. 11, 1992) (holding that "the warranty's reference to 'workmanship' could refer to bicycle designs as well as to implementation of those designs in the manufacturing process."); *see also In re Saturn L-Series Timing Chain Prods. Liab. Litig.*, MDL No. 1920, 2008 WL 4866604, at *14 (D. Neb. Nov. 7, 2008) (internal citations omitted) (concluding that "a defect related to materials and workmanship and a design defect are substantially the same in the context of [the] action" and reasoning that it would be "absurd to interpret [defendant's] written warranty as *not* covering any defect in materials and workmanship if the defect could simultaneously be attributable to a design implemented by the company").

The Ninth Circuit has considered the meaning of "workmanship" in the context of exclusions in insurance contracts and has concluded that "workmanship" includes defects in design. *Tzung v. State Farm Fire & Cas. Co.*, 873 F.2d 1338, 1341 (9th Cir. 1989) ("We believe instead that an unstrained interpretation of the exclusion for 'faulty workmanship' includes losses caused by defects in the design and construction of the building.")  Other courts have reached the opposite conclusion. *See Lombard Corporation v. Quality Aluminum Products Co.,* 261 F.2d 336, 338-39 (6th Cir. 1958) (distinguishing between a design defect and a defect in material or workmanship), *see also Brothers v. Hewlett-Packard* Co., No. C-06-02254 RMW, 2007 WL 485979, at *4 (N.D. Cal. Feb. 12, 2007) ("[T]he Limited Warranty does not guarantee against design defects, it guarantees against defects in materials and workmanship. . .Unlike defects in materials or workmanship, a design defect is manufactured in accordance with the product's

25

intended specifications.").

However, the Court need not construe the terms of the Limited Warranty at all.  As discussed previously, the named Plaintiffs invoked their rights under the warranty, and Defendants provided refunds and/or replacements for the moldy mattresses.  UCC § 2-719 Official Comment 1.  Even if the Court were to ignore Ninth Circuit authority and conclude that the alleged *design* defect was not covered by the "materials and workmanship" language, these terms necessarily would include the alleged design defect at the point that Plaintiffs' recovered under the limited warranty.[14]

### 4.  UCL

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  Accordingly, "[a]n act can be alleged to violate any or all of the three prongs of the UCL—unlawful, unfair, or fraudulent."  *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal.App.4th 1544, 1554 (2007).

#### a.  Statute of Limitations

Defendants contend that Plaintiffs' UCL claim is barred by the statute of limitations.  A claim for relief brought pursuant to the UCL must be "commenced within four years after the cause of action accrued."  Cal. Bus. & Prof. Code § 17208; *see also Harshbarger v. Phillip Morris, Inc.*, No. 02-05267 JSW, 2003 WL 23342396, at *5 (N.D. Cal. April 1, 2003).  In its last order, the Court did not determine whether or not the discovery rule applied to Plaintiffs' UCL claims because Plaintiffs failed to allege when any of the individual plaintiffs actually discovered the mold in their Sleep Number® bed.  According to the TAC, all of the named Plaintiffs purchased their Sleep Number® bed more than four years prior to the filing of the instant action.[15]

_____

[14]  This reasoning would not apply to Karen Williams, who alleges that she never received a refund for her defective replacement.  Should Schlesinger explain his prior contradictory allegations with respect to his receipt of a refund he too might have a viable claim.

[15]  Schlesinger alleges that he first discovered mold in his mattress in 2003, but that he discovered mold in his replacement parts in August 2008.

1    Courts have reached different conclusions as to when a UCL claim accrues.  *Compare*

2  *Rambus Inc. v. Samsung Elecs. Co.*, Nos. C-05-02298 & C-05-00334, 2007 WL 39374, at *3

3  (N.D. Cal. Jan. 4, 2007) ("[plaintiff] cannot rely upon the discovery rule for its Section 17200

4  claim"); *Snapp & Assocs. Ins. Servs., Inc. v. Malcolm Bruce Burlingame Robertson*, 96 Cal. App.

5  4th 884, 891 (2002) ("The 'discovery rule,' which delays accrual of certain causes of action until

6  the plaintiff has actual or constructive knowledge of facts giving rise to the claim, does not apply

7  to unfair competition actions.  Thus, 'the statute begins to run…irrespective of whether plaintiff

8  knew of its accrual, unless plaintiff can successfully invoke the equitable tolling doctrine.'")

9  (citation omitted), *with Mass. Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1295

10  (2002) (statute of limitations for a UCL claim "will probably run from the time a reasonable

11  person would have discovered the basis for a claim").

12    In *Karl Storz Endoscopy-Am., Inc. v. Surgical Tech., Inc..,* 285 F.3d 848, 857 (9th Cir.

13  2002), the Ninth Circuit held that claims under California Business and Professions Code §

14  17200 et seq. are subject to a four-year statute of limitations which begins to run on the date the

15  cause of action accrued, not on the date of discovery.  However, in *Betz v. Trainer Wortham &*

16  *Co.,* 236 Fed. Appx. 253, 256 (9th Cir. May 11, 2007), another Ninth Circuit panel observed that

17  it remains "an open question under California law whether the discovery rule applies to unfair

18  business practices claims."  Subsequently, in *Broberg v. Guardian Life Ins. Co. of Am.,* 171

19  Cal.App.4th 912, 920-21, 90 Cal.Rptr.3d 225, *review denied* (2009), the California Court of

20  Appeal made clear that the discovery rule applies to unfair business practice claims "based on the

21  defendant's allegedly deceptive marketing materials and sales practices, which is simply a

22  different legal theory for challenging fraudulent conduct and where the harm from the unfair

23  conduct will not reasonably be discovered until a future date."  However, the UCL unfair

24  competition claim alleged here is distinguishable from that in *Broberg,* as Plaintiffs do not allege

25  a UCL claim sounding in fraud or misrepresentation.  In fact, on October 30, 2008, the Court

26  dismissed Plaintiffs' previously alleged claims for concealment, intentional misrepresentation,

27  and false advertising without leave to amend.  Because Plaintiffs again fail to allege adequate

28

27

1  facts in support of their UCL claim, the Court need not decide whether the discovery rule tolls

2  the statute of limitations.

3                            b.  "Unlawful" Business Practices

4        For an action based upon an allegedly unlawful business practice, the UCL "borrows

5  violations of other laws and treats them as unlawful practices that the unfair competition law

6  makes independently actionable." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel.

7  Co*., 20 Cal. 4th 163, 180 (1999); *see also Farmers Ins. Exchange v. Superior Court*, 2 Cal. 4th

8  377, 383 (1992).  However, allegations in support of such a claim "must state with reasonable

9  particularity the facts supporting the statutory elements" of the alleged violation.  *Silicon

10 Knights, Inc. v. Crystal Dynamics, Inc*., 983 F. Supp. 1303, 1316 (N.D. Cal. 1997), quoting

11 *Khoury v. Maly's of Cal., Inc*., 14 Cal. App. 4th 612, 619 (1993).  Plaintiffs' negligence and

12 product liability claims may not constitute predicate acts for a UCL claim.  *See Hartless v.

13 Clorox Co.*, No. 06-CV-2705, 2007 WL 3245260, at *5 (S.D. Cal. Nov. 2, 2007) (common-law

14 claims cannot form the basis for a UCL claim).  Accordingly, only Plaintiffs' warranty claims

15 could serve as a predicate for the "unlawful" prong.  For the reasons discussed above, it appears

16 that the only plaintiff who has alleged a warranty claim adequately is Karen Williams, who

17 alleges both that she provided pre-suit notice of the moisture found in her replacement bed and

18 that she never received a refund or second replacement.  *See supra* II.B.2.

19                            c.  "Unfair" Business Practices

20       Plaintiffs also allege a "standalone" UCL claim, *see* TAC ¶¶ 215-239, accusing

21 Defendants of unfair business practices.  "[A] practice may be deemed unfair even if not

22 specifically proscribed by some other law."  *Cel-Tech*, 20 Cal.4th at 180.  However, Plaintiffs

23 again fail to satisfy the first element of an unfair business practices claim under *Camacho v.

24 Automobile Club of Southern California*, 142 Cal.App.4th 1394 (2006).  *See Kilgore v. Keybank*,

25 — F.Supp.2d —, No. C08-2958 TEH, 2010 WL 1461577, at * 8 (N.D. Cal. Apr. 12. 2010)

26 (concluding that the *Camacho* unfairness standard applies within the context of a consumer

27 unfair business practice action), citing *Davis v. Ford Motor Credit Co.,* 179 Cal.App.4th 581,

28

                                      28

596-98, 101 Cal.Rptr.3d 697 (Cal.App.2d Dist.2009).  In *Camacho*, the court stated that a viable

claim for relief may exist if the following conditions are met:  "1) the consumer injury must be

substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or

competition; and (3) it must be an injury that consumers themselves could not reasonably have

avoided."  *Camacho*, 142 Cal.App.4th at 1403.

Plaintiffs allege that the substantial consumer injury here consists of the monetary

expense of replacing their bedding and, in the case of the Fullers, their HVAC system.  TAC ¶

226 (referring back to allegations laying out each named plaintiff's expense for replacing bedding

and the Fullers' HVAC system). While these costs are not *de minimus*, they are consequential

and thus are barred under the Limited Warranty.  *See supra* II.B.2.b.  Accordingly, they cannot be

the basis for Plaintiffs' substantial consumer injury in connection with their UCL claim.

### d.  Available Remedies

A UCL action is equitable in nature, and damages cannot be recovered.  *Korea Supply

Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003).  "[A] plaintiff may obtain

restitution and/or injunctive relief against unfair or unlawful practices in order to protect the

public and restore to the parties in interest money or property taken by means of unfair

competition." *State v. Altus Fin., S.A.*, 36 Cal. 4th 1284, 1303 (2005), quoting *Kraus v. Trinity

Management Services, Inc.* 23 Cal.4th 116, 126, 96 Cal.Rptr.2d 485, 999 P.2d 718 (2000); *see*

Bus. & Prof.Code, § 17204.  However, "[a]s amended pursuant to the 2004 voter approval of

Proposition 64, the UCL in § 17204 now requires a plaintiff to establish that it has 'suffered

injury in fact and has lost money or property.'"  *Walker v. Geico General Ins. Co.*, 558 F.3d

1025, 1027 (9th Cir. 2009), quoting *Californians for Disability Rights v. Mervyn's, LLC*, 39

Cal.4th 223, 46 Cal.Rptr.3d 57, 138 P.3d 207, 209-10 (2006).  As discussed above, almost all of

the named Plaintiffs concede that they have received a refund for their moldy mattresses.[16]  Karen

---

[16]  As discussed above, *see supra* II.B.2b.1, Schlesinger's allegation that he did not
receive a refund upon request is inconsistent with his allegations in the FAC, and he fails to
explain this contradiction despite the Court's explicit request for such an explanation in its order
granting Defendants' motion to dismiss the SAC.

29

1   Williams does plead that she did not receive a refund or an adequate replacement when the

2   interior of her second mattress became soaking wet.  Accordingly, because the other injury-in-

3   fact or restitution requested (replacement bedding and shipping and handling costs) is barred by

4   the Limited Warranty's prohibition on incidental and consequential damages and Plaintiffs do

5   not plead causation adequately, Karen Williams is the only named plaintiff who could seek

6   restitution or injunctive relief pursuant to the UCL.

7          However, notwithstanding Karen Williams' ability to plead injury-in-fact, it appears that

8   all of the named Plaintiffs lack standing to pursue injunctive relief.  In order to obtain prospective

9   injunctive relief, a plaintiff must establish that there is a "likelihood of future injury." *White v.*

10  *Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  "Past exposure to illegal conduct does not in itself

11  show a present case or controversy regarding injunctive relief if unaccompanied by any

12  continuing, present adverse effects." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992).

13  As Defendants point out, "Plaintiffs do not allege that they still use their beds, that they will use

14  their beds in the future, or that they will purchase another Select Comfort bed at any time." *See*

15  *also Stickrath v. Globalstar, Inc.*, 527 F.Supp.2d 992 (N.D. Cal. 2007), quoting *Hodgers-Durgin*

16  *v. de la Vina,* 199 F.3d 1037, 1045 (9th Cir.1999).[17]

17          **5.  Class claims**

18          In order for a class to be certified, the class must be ascertainable. *Bishop v. Saab Auto.*

19  *A.B.,* No. CV 95-0721 JGD (JRX), 1996 WL 33150020, at *4 (C.D.Cal. Feb.16, 1996), citing

20  *Debremaecker v. Short,* 433 F.2d 733 (5th Cir.1970).  A plaintiff seeking to bring a class action

21  has the burden of showing that: (1) the class is so numerous that joinder of all members is

22  impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

23

24          [17]  The Court also notes that, "[a]s the Ninth Circuit has explained, 'system-wide
    injunctive relief is not available based on alleged injuries to unnamed members of a proposed

25  class.... Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not
    represent a class seeking that relief.'" *Stickrath,* 527 F.Supp.2d 992, 997 (N.D. Cal. 2007),

26  quoting *Hodgers-Durgin v. de la Vina,* 199 F.3d 1037, 1045 (9th Cir.1999).  Because the named
    Plaintiffs lack standing to seek injunctive relief, so too does their purported plaintiff class.

27

28

Case Number 08-2746 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTIONS TO STRIKE AND DISMISS, AND DENYING PLAINTIFFS'
MOTION FOR LEAVE TO FILE THEIR FOURTH AMENDED COMPLAINT
(JFLC1)

defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a); *see Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1176 (9th Cir. 2007).  If the plaintiff demonstrates that these four requirements have been satisfied, then he or she also must show "that the action is maintainable under Rule 23(b)(1), (2), or (3)."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *see also Wiener v. Dannon Co., Inc.*, 255 F.R.D. 658, 668 (C.D. Cal. 2009).

### 1. Ascertainability

The TAC defines the proposed plaintiff class as follows, "[a]ll persons located within California or Florida who used and/or purchased the Sleep Number Bed® by Select Comfort from January 1, 1987 through the present and whose beds contain mold."  TAC ¶ 88.  Defendants argue that because the class does not exclude persons who already have received refunds or replacement parts or who have not suffered any damages at all, it is not ascertainable.  The Court agrees.  Defendants point out that "all persons who have merely 'used' a Sleep Number bed in the past twenty-three years, regardless of frequency of use" would be members of the class.  MTS&D at 21.  This could include hotel guests who spent a single night on a Sleep Number Bed®.  "Such members have no injury and no standing to sue." *Hovsepian v. Apple, Inc.,* No. 08-5788 JF (PVT), 2009 WL 5069144, at *6 (N.D. Cal. 2009); *see also Bishop,* 1996 WL 33150020, at *5 ("courts have refused to certify class actions based on similar 'tendency to fail' theories because the purported class includes members who have suffered no injury and therefore lack standing to sue.").[18]

### 2. Predominance of individual issues

Defendants also contend that in the instant case individual issues will predominate and

---

[18]  "Class actions, we believe, must be structured so as to conform in the essential respects to the judicial process. This is the principle by which we are guided. It dictates, inter alia, that the courts not be available to those who have suffered no harm at the hands of them against whom they complain. They have no standing to sue. It is necessary, therefore, to examine the standing of the plaintiffs to initiate the class action before us." *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461, 464 (9th Cir.1973).

31

1   the action will become unmanageable.  They point to the differing claims of property damage

2   even among named plaintiffs, including the Fullers' unique claim that they had to replace their

3   HVAC system.  They suggest that such claims inevitably will raise issues of causation that are

4   individualized and do not lend themselves well to class treatment.  In addition, as the Court has

5   concluded above, recovery for the alleged damage to bedding and related shipping and handling

6   costs appears to be precluded by the Limited Warranty's bar on consequential damages.

7           Defendants also assert correctly that substantial statute of limitations issues are likely to

8   complicate the class claims.  The proposed class encompasses individuals who purchased their

9   mattresses as long as twenty years ago, with no limitation as to when such individuals may have

10  discovered mold in their Sleep Number® beds.  Even if such a limitation were incorporated in

11  accordance with California's delayed discovery rule, there still would have to be an

12  individualized inquiry as to each class member's individual circumstances.  Plaintiffs do not

13  respond to this concern in their opposition papers.

14          Finally, Defendants argue that Plaintiffs' express warranty claims are inappropriate for

15  class treatment.  The Court agrees.  The express warranty claims involve elements that are

16  individual to each purported class member, such as the provision of notice, an opportunity to

17  cure, and reliance. *Tietsworth v. Sears*, No. 5:09-CV-00288 JF (HRL), 2010 WL 1268093, at *20

18  (N.D. Cal. Mar. 31, 2010) (citation omitted); *see also Cole v. Gen. Motors.,* 484 F.3d 717, 724-

19  30 (5th Cir. 2007) (explaining why certain warranty claims are inappropriate for class treatment).

20  The TAC represents Plaintiffs' fourth attempt to plead sufficient class allegations.  Each of

21  Defendants' arguments was raised on their last motion to strike, and the Court granted that

22  motion.  Plaintiffs have not altered their class definition in response to the Court's previously

23  expressed concerns, nor have they attempted to address the majority of Defendants' arguments in

24  support of the instant motion to strike.  Accordingly, because further attempts to amend class-

25  wide allegations appear to be futile, the motion to strike class allegations will be granted without

26  leave to amend.

27

28

Case Number 08-2746 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTIONS TO STRIKE AND DISMISS, AND DENYING PLAINTIFFS'
MOTION FOR LEAVE TO FILE THEIR FOURTH AMENDED COMPLAINT
(JFLC1)

1

## III. MOTION FOR LEAVE TO FILE FOURTH AMENDED COMPLAINT

2

### A. Background

3      Plaintiffs seek leave to file their proposed fourth amended complaint ("PFAC").  In the

4  PFAC, Plaintiffs plead individual and class claims for negligence, strict liability, and violations

5  of the UCL based on personal injury.  Plaintiffs also substantially re-plead the allegations of the

6  TAC.  In her original complaint, Stearns alleged individual and class claims for strict product

7  liability, breach of express and implied warranties, fraud, and negligent misrepresentation,

8  including claims for relief based upon alleged personal injury.  On October 1, 2008, the Court

9  dismissed that complaint, struck the class claims, provided guidance on how to plead the alleged

10  claims adequately, and encouraged Stearns to narrow the proposed class.  Dkt. No. 28 at 5-6, 8,

11  13.

12      Plaintiffs did not re-allege their personal injury claims in the FAC, but they did continue

13  to assert a nationwide class, added five named plaintiffs and one Defendant (Sleep Train), and

14  alleged seventeen claims for relief.  On June 5, 2009, the Court granted Defendants' motion to

15  dismiss the FAC and granted limited leave to amend, specifically instructing Plaintiffs that they

16  must seek leave of Court to add any *new* claims.  Then, on July 6, 2009, Plaintiffs filed their

17  SAC, which re-introduced personal injury claims.  Because Plaintiffs failed to seek leave of

18  Court to expand the scope of the FAC, the Court granted Defendants' motion to strike the

19  personal injury claims.  On January 4, 2010, Plaintiffs filed the operative TAC.  On March 12,

20  2010, the same day that Defendants filed the instant motion to dismiss, Plaintiffs filed their

21  motion for leave to file the PFAC.

22      Plaintiffs allege that Stearns, Bryan Williams, Dennis Fuller, Bonnie Fuller, Ruth Rose,

23  and Dan Schlesinger "suffered injuries and received treatment as a result of defendants [sic]

24  product. . ." PFAC ¶ 134.  They also claim that "[t]he full nature and extent of said injuries are

25  not known to plaintiffs and [] request[] [leave] to amend this complaint to conform to proof at

26  time of trial."  *Id.*  The allegations of personal injury in the PFAC include the following:

27              (a) Molly Stearns suffered various injuries, including but not limited to, lung and
                pulmonary distress, lung biopsy and other lung related treatment.

28

Case Number 08-2746 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTIONS TO STRIKE AND DISMISS, AND DENYING PLAINTIFFS'
MOTION FOR LEAVE TO FILE THEIR FOURTH AMENDED COMPLAINT
(JFLC1)

(b) Bryan Williams suffered various injuries, including but not limited to lung and pulmonary distress, lung biopsy and other lung related treatment.
(c) Dennis Fuller suffered various injuries, including but not limited to skin irritation, blemishes and other skin infection treatment.
(d) Bonnie Fuller suffered various injuries, including but not limited to nasal, pulmonary distress and other lung related treatment.
(e) Ruth Rose suffered various injuries, including but not limited to skin, pulmonary distress and other lung related treatment.
(f) Dan Schlesinger suffered various injuries, including but not limited to skin, pulmonary distress and other lung related treatment.

*Id.* ¶ 169.  Plaintiffs allege that they have incurred and will continue to incur medical expenses as a result of these personal injuries and will suffer loss of income, wages, and other pecuniary consequences.  *Id.* ¶¶ 135, 136, 137, 170, 171, 172.

**A.  Legal Standard**

Federal Rule of Civil Procedure 15(a) governs the amendment of pleadings. The Ninth Circuit has held that the rule should be applied with "extreme liberality." *DCD Programs, LTD. v. Leighton,* 833 F.2d 183, 186 (9th Cir. 1987); *Howey v. United States,* 481 F.2d 1187, 1190 (9th Cir. 1973).  However, leave to amend "is not to be granted automatically." *Zivkovic v. S. Cal. Edison Co.,* 302 F.3d 1080, 1087 (9th Cir. 2002), quoting *Jackson v. Bank of Hawaii,* 902 F.2d 1385, 1387 (9th Cir. 1990). Rather, a court must consider whether the proposed amendment (1) would be futile, (2) would prejudice the non-moving party, (3) was brought in bad faith, or (4) resulted from undue delay. *Genentech, Inc. v. Abbott Labs.,* 127 F.R.D. 529, 530 (N.D. Cal. 1989), citing *DCD Programs,* 833 F.2d at 186. Absent prejudice, or a strong showing of any of the remaining factors, there exists a presumption under Rule 15(a) in favor of granting leave to amend. *See Lowrey v. Tex. A & M Univ. Sys.,* 117 F.3d 242, 245 (5th Cir.1997).

**B. Discussion[19]**

Defendants carry the burden of showing why leave to amend should not be granted.

---

[19]  Plaintiffs submit objections to fourteen statements made by Defendants in their opposition papers to the instant motion for leave to file the PFAC.  Because it does not rely upon any of these statements in reaching its disposition of the motion, the Court need not determine the merits of the objections.  However, the Court will note that the concerned statements appear to be legal arguments or characterizations of Plaintiffs' allegations based upon Defendants' legal positions.

Case Number 08-2746 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTIONS TO STRIKE AND DISMISS, AND DENYING PLAINTIFFS' MOTION FOR LEAVE TO FILE THEIR FOURTH AMENDED COMPLAINT
(JFLC1)

1   *Genentech,* 127 F.R.D. at 530-31. They contend that the proposed amendments: (1) would be

2   futile; (2) would cause them substantial prejudice; (3) are brought in bad faith; and (3) are the

3   result of unreasonable delay.

4         **1. Futility**

5        "[C]ourts will determine the legal sufficiency of a proposed amendment using the same

6   standard as applied on a Rule 12(b)(6) motion, *see Miller v. RykoffSexton, Inc.,* 845 F.2d 209,

7   214 (9th Cir. 1988), [however] such issues are often more appropriately raised in a motion to

8   dismiss rather than in an opposition to a motion for leave to amend." *SAES Getters S.p.A. v.*

9   *Aeronex, Inc.*, 219 F.Supp.2d 1081, 1086 (S.D. Cal. 2002), citing William W. Schwarzer, et al.,

10   CAL. PRAC. GUIDE: FED. CIV. PROC. BEFORE TRIAL § 8:422); *see also Centeno v. Wilson*,

11   No. 1:08-CV-1435-FJM, 2010 WL 1980157, at *1 (E.D. Cal. May 17, 2010) ("We apply the

12   same standard for determining the legal sufficiency of a proposed amendment that we apply in

13   deciding a Rule 12(b)(6) motion").  Because the allegations in the PFAC are nearly identical to

14   those in the TAC – with the exception of those related to personal injuries –  the parties have had

15   a full opportunity to brief the sufficiency of Plaintiffs' pleadings.  Accordingly, for the same

16   reasons that the Court concluded above that Defendants' motion to dismiss the TAC should be

17   granted without leave to amend (with the exception of the claims pled by the Williamses and

18   Schlesinger), *see supra* II, the Court also will deny Plaintiffs' request for leave to file the PFAC

19   as its reframing of Plaintiffs' previous claims and its class definitions suffers from almost all of

20   the same problems.[20]

21        Plaintiffs' newly-framed class claims for personal injury also appear to be futile.  In

22   dismissing Stearns' original complaint, the Court noted the inherent difficulty and problems

23   posed by class-wide personal injury claims.  Dkt. 28 at 11-12, citing *Kennedy v. Baxter*

24

25   ───────────────

   [20]  The class definition for those plaintiffs who have not suffered personal injuries

26   includes those persons who: (1) have received refunds or non-defective replacements of their
   moldy mattresses; (2) entered limited warranty agreements that bar consequential damages such

27   as damage to their bedding and shipping and handling costs; (3) discovered mold in their
   mattress outside of the statute of limitations; and (4) failed to provide Defendants with notice of

28   the defect or an opportunity to cure.

Case Number 08-2746 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTIONS TO STRIKE AND DISMISS, AND DENYING PLAINTIFFS'
MOTION FOR LEAVE TO FILE THEIR FOURTH AMENDED COMPLAINT
(JFLC1)

*Healthcare Corp.,* 50 Cal.Rptr.2d 744, 743-44 (Cal. Ct. App. 1996) ("As the California Supreme

Court has observed class actions for personal injuries in mass tort litigation present a multitude

of problems."); *see also  Zinser v. Accufix Research Inst.,* 253 F.3d 1180, 1186 (9th Cir.2001)

("Our circuit has recognized the potential difficulties of 'commonality' and 'management'

inherent in certifying products liability class actions."). The Court's previously expressed view

that personal injury claims are not appropriate for class treatment has not changed since its

holding almost two years ago.

In support of their individual personal injury claims, Plaintiffs allege that they have

suffered various injuries, including but not limited to, lung and pulmonary distress, skin

irritation, blemishes, other skin infection treatment, and other lung related treatment. PFAC ¶¶

134, 170. Plaintiffs also plead collectively that they had to pay for "checkups, medication,

diagnostic testing, biopsies, medical, surgical, and other related expenses" and that they "will be

forced to pay" for these same medical expenses in the future as a result of "negligence of the

defendants." *Id.* ¶¶ 135, 136, 170, 171. These conclusory and generalized allegations do not

meet the pleading standard of Fed. R. Civ. P. 8. *See Iqbal*, 129 S.Ct. at 1949 ("a formulaic

recitation of the elements of a cause of action will not do."); *see also Clegg*, 18 F.3d at 754-755

(9th Cir. 1994). Plaintiffs' allegations with respect to causation suffer from the same deficiency.

*See e.g.*, PFAC ¶¶ 134, 169 (concluding that "as a direct and proximate result of the negligence

of the defendants, and each of them, plaintiff suffered grievous personal injuries. . . ). However,

Plaintiffs' failure to plead their personal injury claims with sufficient specificity may be cured by

amendment.

Defendants contend that allowing Stearns to amend her individual personal injury claims

is futile because Stearns waived these claims when she neglected to re-allege them in the FAC

after her original complaint was dismissed. The Ninth Circuit recently clarified that "a plaintiff

who omits previously dismissed claims from an amended complaint [does not] waive his right to

reallege these claims in further amendments at the district court level." *New York City*

*Employees' Ret. Sys. v. Jobs,* 593 F.3d 1018, 1025 (9th Cir. 2010). Accordingly, Stearns has not

Case Number 08-2746 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTIONS TO STRIKE AND DISMISS, AND DENYING PLAINTIFFS'
MOTION FOR LEAVE TO FILE THEIR FOURTH AMENDED COMPLAINT
(JFLC1)

1  waived her right to plead personal injury claims.

2  Defendants also argue that allowing Schlesinger and Bryan Williams to assert personal

3  injury claims would be futile because the claims are barred by the applicable two-year statute of

4  limitations. *See* Cal. Code. Civ. P. § 335.1.  Defendants point out that Schlesinger alleges he

5  first discovered mold in his mattress in 2003 or 2004,[21] *See* PFAC ¶ 51, 61, and that Bryan

6  Williams discovered mold in his mattress on October 22, 2006.

7  "A cause of action normally accrues when under the substantive law the wrongful act is

8  done and the liability or obligation arises, that is, when the action may be brought." *Clark v.*

9  *Upton*, — F.Supp.2d —, 2010 WL 1027526, at *6, (E.D. Cal. Mar. 18, 2010), quoting *Mosesian*

10  *v. County of Fresno,* 28 Cal.App.3d 493, 500, 104 Cal.Rptr. 655 (1972).  "An exception to the

11  general rule for defining the accrual of a cause of action-indeed, the 'most important' one-is the

12  discovery rule." *Id.,* quoting *Norgart v. Upjohn Co.*, 21 Cal.4th 383, 397-398, 87 Cal.Rptr.2d

13  453, 981 P.2d 79 (1999).  "[U]nder the delayed discovery rule, a cause of action accrues and the

14  statute of limitations begins to run when the plaintiff has reason to suspect an injury and some

15  wrongful cause, unless the plaintiff pleads and proves that a reasonable investigation at that time

16  would not have revealed a factual basis for that particular cause of action.  In that case, the statute

17  of limitations for that cause of action will be tolled until such time as a reasonable investigation

18  would have revealed its factual basis." *Id.*, quoting *Fox v. Ethicon Endo-Surgery, Inc.,* 35

19  Cal.4th 797, 802, 27 Cal.Rptr.3d 661, 110 P.3d 914 (2005); *see also Hopkins v. Dow Corning*

20  *Corp.*, 33 F.3d 1116, 1120 (9th Cir. 1994) ("Under California's discovery rule, the accrual date

21  of a cause of action is delayed until the plaintiff is aware of her injury and its negligent cause.").

22  "To invoke the discovery rule, plaintiff must plead facts which show '(1) the time and manner of

23  discovery and (2) the inability to have made earlier discovery despite reasonable diligence.'"

24

25  [21]  As noted several times previously, Schlesinger's allegations as to when he first
discovered mold in his bed are inconsistent.  In paragraph 51 he alleges that he first found mold
26  in his mattress on September 23, 2004; in paragraph 61 he alleges that he first called Select
Comfort with respect to mold in his bed in 2003.  However, this discrepancy has no bearing on
27  the Court's determination with respect to the statute of limitations, as both of these dates were
more than two years before the commencement of the instant action.
28

37

1  *Hopkins*, 33 F.3d at 1120, quoting *Saliter v. Pierce Bros. Mortuaries,* 81 Cal.App.3d 292, 146

2  Cal.Rptr. 271, 274 (Ct.App.1978)

3        While Schlesinger first discovered mold in his mattress in 2003 of 2004, it is unclear

4  from the PFAC, as it is currently pled, when Schlesinger first experienced personal injuries and

5  when he realized that these injuries were caused by the mold in his mattress.  While the omission

6  of such facts highlights a deficiency in Schlesinger's pleading of the delayed discovery rule, it

7  also prevents the Court from making a definitive determination that Schlesinger's claim is time-

8  barred.  Bryan Williams' pleadings present a different set of alleged facts.  In her letter to

9  Defendants dated May 14, 2007, Karen Williams states that mold was discovered in the bed on

10  October 22, 2006, that "upon discovery of the moldy bed, it was immediately removed from the

11  home," and that "upon discovery of the moldy bed, [sic] immediately raised the question; could

12  the MOLD found covering the inside of the Sleep Number bed possibly have had anything [sic]

13  thing to do with the illness' [sic], lung masses and lump in the lung?????  So research began, and

14  every test imaginable was done. . ."  PFAC, Ex. C; *see contra* PFAC ¶ 52 (alleging that the

15  Williamses first discovered mold in the mattress on October 26, 2008).  The letter makes clear

16  that Karen and Bryan Williams suspected that the mold in the mattress was responsible for

17  Bryan's personal injuries no later than October 22, 2006.  The statute of limitations began to run

18  on that date.  *Norgart,* 21 Cal.4th at 397 ("Under *Jolly*. . .the plaintiff discovers the cause of

19  action when he at least suspects a factual basis, as opposed to a legal theory, for its elements,

20  even if he lacks knowledge thereof – when, simply put, he at least 'suspects. . .that someone has

21  done something wrong' to him. . ."), quoting *Jolly v. Eli Lilly & Co.,* 44 Cal.3d 1103, 1110, 245

22  Cal.Rptr. 658, 751 P.2d 923 (1988).

23        While they cite no legal authority in support of their argument, Plaintiffs appear to

24  contend that the statute of limitations with respect to Schlesinger's and Bryan Williams' personal

25  injury claims also should be tolled because Defendants made affirmations that the mattresses

26  would not "incubate" or "produce" mold and were not the cause of their personal injuries.

27  "Under California law, equitable tolling will be warranted where the defendants have induced the

28

38

plaintiff to delay filing until after the statute of limitations has run." *Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1127 (9th Cir. 2008), citing *Mills v. Forestex Co.,* 108 Cal.App.4th 625, 652, 134 Cal.Rptr.2d 273 (2003) (citation omitted).  While the PFAC presently does not allege facts that would support equitable tolling on this basis, it is not apparent at this time that Plaintiffs cannot do so.

Finally, Defendants argue that Bryan Williams cannot maintain his personal injury claim in this action because he is litigating the same claim against the same Defendants in the San Mateo Superior Court.  *See* Declaration of Andrew V. Stearns in Support of Plaintiffs' Reply to Motion for Leave to File Fourth Amended Class Action Complaint, Ex. G (Complaint filed in *Bryan Williams v. Select Comfort Retail Corp.*, *et al,* No. Civ. 477710, dated October 22, 2008).[22]   This is not so. "[O]verlapping or even identical federal and state court litigation may proceed simultaneously. . .The rule that permits simultaneous litigation in state and federal court of overlapping and even identical cases is deeply rooted in our system."  *Noel v. Hall*, 341 F.3d 1148, 1159 (9th Cir. 2003); *see also Atlantic Coast Line Railroad v. Brotherhood of Locomotive Engineers,* 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970) ("[T]he state and federal courts had concurrent jurisdiction in this case, and neither court was free to prevent either party from simultaneously pursuing claims in both courts.").  However, concurrent state and federal litigation of identical claims is "limited. . by doctrines of abstention and comity."  *Noel*, 341 F.3d at 1159.  Accordingly, while Bryan Williams may maintain two separate lawsuits that allege identical claims, the Court notes that it too may abstain from ruling on his claims while they are pending before the state court.

Accordingly, while Plaintiffs' individual personal injury claims are not pled with the detail required by Fed. R. Civ. P. 8, Defendants have not shown that allowing Plaintiffs to amend

---

[22]   Bryan Williams filed his personal injury claim in state court on October 22, 2008. While this fact establishes that Defendants did not induce him to delay filing beyond October 22, 2008, it is unclear from the PFAC when the alleged tolling of the statute of limitations began.

39

1   these particular claims would be futile.[23]

2       **2. Prejudice**

3       To overcome Rule 15(a)'s liberal policy with respect to the amendment of pleadings a

4   showing of prejudice must be substantial. *Genentech*, 127 F.R.D. at 530-31. Neither delay

5   resulting from the proposed amendment nor the prospect of additional discovery needed by the

6   non-moving party in itself constitutes a sufficient showing of prejudice. *Genentech*, 127 F.R.D.

7   at 530-32; *United States v. Continental Ill. Nat'l Bank and Trust Co. of Chicago*, 889 F.2d 1248,

8   1255 (2d Cir. 1989). Nonetheless, "[d]istrict courts do not abuse their discretion when they deny

9   motions to amend that would cause undue delay and prejudice." *Dong Ah Tire & Rubber Co.*,

10  *Ltd. v. Glasforms, Inc.*, No. C 06-3359 JF (RS), 2009 WL 667171, at *2 (N.D. Cal. Mar.10,

11  2009), citing *Texaco, Inc. v. Ponsoldt,* 939 F.2d 794, 798 (9th Cir.1991); *see also Lockheed*

12  *Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 986 (9th Cir.1999) ("A need to reopen

13  discovery and therefore delay the proceedings supports a district court's finding of prejudice from

14  a delayed motion to amend").

15      Defendants contend that they will suffer prejudice if Plaintiffs are allowed to file a fifth

16  complaint because rather than conducting an investigation, Plaintiffs have "repeatedly insisted on

17  bringing the broadest, everything-but-the-kitchen-sink claims possible and have insisted on

18  attempting to maintain the suit as an unworkable class action, in an attempt to expand this case

19  into something it is not, thereby necessitating Defendants' successive motions to dismiss and

20  strike.  Defendants argue that at some point, forcing [them] to again incur thousands of dollars to

21

22
23      [23] Defendants do not otherwise challenge the futility of the personal injury claims
    brought by Rose or Dennis Fuller.  Defendants do contend that Bonnie Fuller's allegations of
24  personal injuries are inconsistent with prior pleadings because she neglected to assert these same
    injuries in the SAC.  However, Bonnie Fuller's prior silence on the topic of personal injuries
25  does not contradict her assertion of them now.
26      Defendants also assert a passing challenge to venue with respect to the Fullers (who are
    Florida residents) in a footnote of their opposition papers to Plaintiffs' motion for leave to file
27  the PFAC.  This is an inappropriate vehicle for raising a motion to dismiss for lack of venue.  If
    Defendants wish to challenge venue as to the Fullers they may do so in a future properly noticed
28  motion.

40

1   dismiss the complaint becomes prejudicial and unfair." Opp. Mot. At 24. Moreover, Defendants

2   argue that in the two years since litigation has commenced, much of the property that Plaintiffs

3   claim has been destroyed by mold has been lost or altered, making Defendants ability to defend

4   against such claims more difficult. Finally, Defendants argue that permitting Plaintiffs to add

5   personal injury claims will change the gravamen of the case, resulting in prejudice to Defendants.

6   *See Morongo Band of Mission Indians*, 893 F.2d 1074, 1079 (9th Cir. 1990) ("The new claims

7   set forth in the amended complaint would have greatly altered the nature of the litigation and

8   would have required defendants to have undertaken, at a late hour, an entirely new course of

9   defense. Again, this factor is not fatal to amendment*, DCD Programs, Ltd.,* 833 F.2d at 186, but

10  it enters into the balance.")

11      Plaintiffs contend that they will suffer prejudice if they are not permitted to amend to

12  plead their personal injury claims, but they do not address Defendants' concerns. Plaintiffs also

13  argue that they need not seek leave to plead these claims because a "plaintiff is not prohibited

14  from realleging claims" that he has omitted in previous pleadings. Reply at 10. However, this

15  Court limited the scope of any amendment in its order dismissing the FAC, and consistent with

16  that order, Plaintiffs were required to make the instant motion.

17      The Court acknowledges the expense incurred by Defendants in defending this action and

18  their frustration with litigating Plaintiffs' four failed attempts to state a claim upon which relief

19  may be granted. However, Plaintiffs have attempted to plead individual personal injury claims

20  only on one prior occasion.[24] Moreover, Defendants' continued expense in litigating the action

21  will be mitigated by the fact that the Court will deny leave to amend with respect to all of

22  Plaintiffs' class allegations. *See supra* II.B, III.B.1.

23

24  ─────────────────

25      [24] While Plaintiffs technically did allege personal injury claims in the SAC as well as
    their original complaint, the Court did not address the allegations in the SAC substantively or

26  provide guidance with respect to their sufficiency because they were new claims pled without
    leave of Court. Dkt. 70 at 9-10 (dismissing Plaintiffs' personal injury claims and explaining that

27  the Court's prior order granted limited leave to amend and stated clearly that "Plaintiffs shall not
    add any new defendants, plaintiffs or claims for relief without leave of the Court.")

28
                                          41

### 3. Bad Faith

"Examples of bad faith have included-but are not limited to-instances in which a party makes a claim without alleging any newly discovered facts, makes a tactical decision to omit a claim to avoid summary judgment, or includes a claim to harass or burden the other party." *E.g., Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1161 (9th Cir.1989); *Acri v. International Ass'n of Machinists & Aerospace Workers,* 781 F.2d 1393, 1398 (9th Cir.1986); *M/V American Queen v. San Diego Marine Const. Corp.*, 708 F.2d 1483, 1492 (9th Cir.1983). Defendants argue that Plaintiffs chose not to allege their personal injury claims in the FAC in a tactical move to preserve their class claims and counsel's fees, but "now that Plaintiffs' hopes of bringing a class action have faded, they have brought individual personal injury claims, gambling that something will go forward." Opp. Mot. At 23. Moreover, Defendants argue that it is "bad faith for B. Williams to assert a personal injury claim because he has an identical claim pending in California state court against Select Comfort." *Id.* at 23 n. 18.

While the pendency of Bryan Williams's state court claim raises the possibility of duplication of resources or conflicting determinations, it does not establish bad faith. Plaintiffs argue that Defendants have been on notice of Plaintiffs' personal injury claims through their customer complaints, original pleading and SAC, and communications between counsel. The Court concludes that Plaintiffs' pleading practice does not rise to the level of bad faith.

### 4. Delay

While delay alone will not justify the denial of leave to amend, *DCD Programs,* 833 F.2d at 186, "'late amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action.'" *Dong Ah Tire & Rubber Co.,* 2009 WL 667171, at *3, quoting *Acri v. International Ass'n of Machinists & Aerospace Workers,* 781 F.2d 1393, 1398 (9th Cir.1986) (citations omitted). Plaintiffs first alleged personal injury claims in their original complaint and then attempted to allege the same claims in their SAC. Accordingly, it does not appear that Plaintiffs purposefully or negligently delayed in pleading personal injury claims. In fact, with the

Case Number 08-2746 JF (PVT)
ORDER GRANTING DEFENDANTS' MOTIONS TO STRIKE AND DISMISS, AND DENYING PLAINTIFFS' MOTION FOR LEAVE TO FILE THEIR FOURTH AMENDED COMPLAINT (JFLC1)

1  exception of the FAC, Plaintiffs have attempted to plead personal injury claims consistently.

2  Accordingly, although it will deny their motion for leave to file the PFAC in its present form, the

3  Court will grant Plaintiffs leave to amend their individual personal injury claims.

4  ## IV.  ORDER

5        Good cause therefor appearing, Defendants' motions to strike Plaintiffs' class allegations

6  and dismiss the TAC are GRANTED as set forth herein.  Plaintiffs' motion for leave to file the

7  PFAC is DENIED.  Plaintiffs may file a new pleading limited to their individual personal injury

8  claims, as well as Karen and Bryan Williams' claims for negligence, strict product liability,

9  breach of express warranty, and violations of the MMWA.  Schlesinger may attempt to explain

10  the factual contradictions with respect to his warranty claims.  Any such pleading shall be filed

11  within thirty (30) days of the date of this order.  Plaintiffs shall not add any new defendants,

12  plaintiffs or claims for relief without leave of Court.

13        IT IS SO ORDERED.

14        DATED: July 21, 2010

15

16  _____
JEREMY FOGEL
United States District Judge