Robert M. Gagliasso, Esq. SBN 162082
Andrew V. Stearns, Esq. SBN 164849
Steven M. Berki, Esq. SBN 245426
**BUSTAMANTE, O'HARA & GAGLIASSO**
River Park Tower
333 W. San Carlos St., 8th Floor
San Jose, California 95110
Telephone: (408) 977-1911
rgagliasso@boglawyers.com
astearns@boglawyers.com
sberki@boglawyers.com

Attorneys for Plaintiffs
MOLLY STEARNS, RUTH ROSE,
DENNIS FULLER, BONNIE FULLER,
DAN SCHLESINGER, KAREN WILLIAMS
and BRYAN WILLIAMS

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

\* \* \*

| | |
|---|---|
| MOLLY STEARNS, RUTH ROSE, DENNIS FULLER, BONNIE FULLER, DAN SCHLESINGER, KAREN WILLIAMS, AND BRYAN WILLIAMS | Case No. C08 02746 JF PVT |
| | **FIFTH AMENDED COMPLAINT FILED PENDING RESOLUTION OF STIPULATION TO BE FILED UPON SELECTION OF MEDIATION DATE** |
| Plaintiffs, | |
| vs. | |
| | **DEMAND FOR JURY TRIAL** |
| SELECT COMFORT RETAIL CORPORATION, a Minnesota Corporation; BED BATH & BEYOND, INC., a New York Corporation; THE SLEEP TRAIN, INC., a California Corporation, and DOES 1 through 50,000, inclusive, | **REQUEST FOR PUNITIVE DAMAGES REQUEST FOR INJUNCTIVE RELIEF** |
| Defendants | |

Plaintiffs, individually described hereinbelow, hereby file the attached Exhibit 1, Fifth

Amended Complaint for damages, pending resolution of the *Amended Stipulation to Attend*

*Mediation and to Stay All Filing Deadlines Pending Resolution of Mediation* to be filed by the

parties upon mutual agreement of a specific date for the mediation session before Mr. Brad

Bening. The *Amended Stipulation* has not yet been filed or approved by the Court as of the date

of this filing because the parties are actively coordinating a <u>specific</u> date whereby all

interested persons may attend.  In the event the Court approves the Stipulation and orders

mediation as agreed to by the parties prior to the filing of this Complaint, plaintiffs reserve all

rights under said Stipulation and this filing shall be deemed void for all purposes.

DATE: June 15, 2011                              BUSTAMANTE O'HARA & GAGLIASSO


                                                 _____/S/_____
                                                 ROBERT M. GAGLIASSO
                                                 ANDREW V. STEARNS
                                                 STEVEN M. BERKI
                                                 Counsel of Record for Plaintiffs

**EXHIBIT 1**

Robert M. Gagliasso, Esq. SBN 162082
Andrew V. Stearns, Esq. SBN 164849
Steven M. Berki, Esq. SBN 245426
**BUSTAMANTE, O'HARA & GAGLIASSO**
River Park Tower
333 W. San Carlos St., 8th Floor
San Jose, California 95110
Telephone: (408) 977-1911
rgagliasso@boglawyers.com
astearns@boglawyers.com
sberki@boglawyers.com

Attorneys for Plaintiffs
MOLLY STEARNS, RUTH ROSE,
DENNIS FULLER, BONNIE FULLER,
DAN SCHLESINGER, KAREN WILLIAMS
and BRYAN WILLIAMS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

* * *

| | |
|---|---|
| MOLLY STEARNS, RUTH ROSE, DENNIS FULLER, BONNIE FULLER, DAN SCHLESINGER, KAREN WILLIAMS, AND BRYAN WILLIAMS<br><br>Plaintiffs,<br><br>vs.<br><br>SELECT COMFORT RETAIL CORPORATION, a Minnesota Corporation; BED BATH & BEYOND, INC., a New York Corporation; THE SLEEP TRAIN, INC., a California Corporation, and DOES 1 through 50,000, inclusive,<br><br>Defendants. | Case No. C08 02746 JF PVT<br><br>**FIFTH AMENDED COMPLAINT FOR: NEGLIGENCE; STRICT PRODUCTS LIABILITY; VIOLATION OF MAGNUSSON-MOSS WARRANTY ACT; BREACH OF EXPRESS WARRANTY; AND UNFAIR COMPETITION LAW**<br><br>**DEMAND FOR JURY TRIAL REQUEST FOR PUNITIVE DAMAGES REQUEST FOR INJUNCTIVE RELIEF** |

Plaintiffs, individually described hereinbelow, allege the following on information and

belief and/or on personal knowledge depending on those allegations and claims which are

FIFTH AMENDED INDIVIDUAL COMPLAINT FOR: NEGLIGENCE; STRICT PRODUCTS LIABILITY; VIOLATION OF MAGNUSSON-MOSS WARRANTY ACT; BREACH OF EXPRESS
WARRANTY; AND UNFAIR COMPETITION LAW

1  limited solely to individual plaintiffs as provided herein:

2  **INTRODUCTION**

3      1.   Plaintiff MOLLY STEARNS brings this action individually with claims arising

4  from Negligence, Strict Products Liability, and who purchased a Sleep Number® bed designed,

5  manufactured, distributed and sold by defendant SELECT COMFORT RETAIL CORPORATION

6  and its agents.

7      2.   Plaintiff RUTH ROSE brings this action individually with claims arising from

8  Negligence, Strict Products Liability, and who purchased a Sleep Number® bed designed,

9  manufactured, distributed and sold by defendant SELECT COMFORT RETAIL CORPORATION

10  and its agents.

11      3.   Plaintiff DENNIS FULLER brings this action individually with claims arising from

12  Negligence, Strict Products Liability, and who purchased a Sleep Number® bed designed,

13  manufactured, distributed and sold by defendant SELECT COMFORT RETAIL CORPORATION

14  and its agents.

15      4.   Plaintiff DAN SCHLESINGER brings this action individually with claims arising

16  from Negligence, Strict Products Liability, Magnusson-Moss, breach of warranty, and UCL, and

17  who purchased a Sleep Number® bed designed, manufactured, distributed and sold by

18  defendant SELECT COMFORT RETAIL CORPORATION and its agents.

19      5.   BONNIE FULLER, brings this action individually with claims arising from

20  Negligence, Strict Products Liability, Magnusson-Moss, breach of warranty, and UCL, and who

21  purchased a Sleep Number® bed designed, manufactured, distributed and sold by defendant

22  SELECT COMFORT RETAIL CORPORATION and its agents.

23      6.   Plaintiff KAREN WILLIAMS brings this action individually with claims arising

24  from negligence, strict products liability, Magnusson-Moss, breach of warranty, and UCL who

25  purchased a Sleep Number® bed designed, manufactured, distributed and sold by defendant

26  SELECT COMFORT RETAIL CORPORATION and its agents.

27      7.   Plaintiff BRYAN WILLIAMS brings this action individually with claims arising

28

1  from Negligence, Strict Products Liability, and UCL, and who used a Sleep Number® bed

2  designed, manufactured, distributed and sold by defendant SELECT COMFORT RETAIL

3  CORPORATION and its agents.

4  **JURISDICTION AND VENUE**

5  8.  This Court has jurisdiction over this action pursuant to Defendants' Notice of

6  Removal and Demand for Jury Trial ("Notice"), filed June 2, 2008 and subsequent Order

7  Granting Defendants' Notice.  This Court additionally has federal question jurisdiction based

8  on claims arising under the Magnusson-Moss Warranty Act.

9  9.  Plaintiffs bring this action to obtain damages, restitutionary disgorgement,

10  injunctive and other relief, individually and on behalf of all others similarly situated, under the

11  laws of the United States of America and the State of California.

12  10.  Plaintiffs' First Amended Complaint was dismissed by Order on Motion to

13  Dismiss filed June 5, 2009.  [ECF Docket No. 59].  Plaintiffs were granted limited leave to

14  amend.  For purposes of appeal, plaintiffs hereby incorporate by reference ECF Docket No. 59

15  in full as though fully set forth herein.

16  11.  Plaintiffs' Second Amended Complaint was dismissed by Order on Motion to

17  Strike filed December 4, 2009.  [ECF Docket No. 70].  Plaintiffs were granted limited leave to

18  amend.  For purposes of appeal, plaintiffs hereby incorporate by reference ECF Docket No. 70

19  in full as though fully set forth herein.

20  12.  Plaintiffs' Third Amended Complaint was dismissed by Order on Motion to Strike

21  filed July 21, 2010.  [ECF Docket No. 93].  Plaintiffs were granted limited leave to amend.  For

22  purposes of appeal, plaintiffs hereby incorporate by reference ECF Docket No. 93 in full as

23  though fully set forth herein.

24  13.  Plaintiffs' brought a Motion for Leave to File a Fourth Amended Complaint which

25  was denied by the Court in its Order on Motion to Strike Filed July 21, 2010 referenced in ¶ 12

26  above.  [ECF Docket No. 93].

27  14.  Defendant SELECT COMFORT RETAIL CORPORATION ("SELECT COMFORT") has

28

1    sufficient minimum contacts with the State of California through the use of retail stores, online

2    sales, advertising, promotion, sale, marketing and/or distribution of its Sleep Number® bed to

3    render the exercise of personal jurisdiction by the State of California permissible under

4    traditional notions of fair play and substantial justice.

5        15.  Defendant BED, BATH & BEYOND, INC. ("BBB") has sufficient minimum contacts

6    with the State of California through the use of retail stores for the promotion, sale, marketing

7    and/or distribution of its products to render the exercise of personal jurisdiction by the State

8    of California permissible under traditional notions of fair play and substantial justice.

9        16.  Defendant THE SLEEP TRAIN, INC. ("SLEEP TRAIN") originally named herein as

10   DOE 1, is a California corporation and has sufficient minimum contacts with the State of

11   California through the use of retail stores for the promotion, sale, marketing and/or

12   distribution of its products to render the exercise of personal jurisdiction by the State of

13   California permissible under traditional notions of fair play and substantial justice.

14       17.  Venue is proper in this Court because the acts upon which this action is based

15   occurred in part in this State, Florida and other states of the United States of America.

16   Plaintiffs are from the states of California and Florida.  The general public was damaged and

17   subjected to irreparable harm in this venue due to defendants' unfair, unlawful and deceptive

18   business activities in this state and in Florida.  Further, defendants received substantial

19   compensation and profits in this State, Florida and other states of the United States of

20   America.

21                                **PARTIES**

22       18.  Plaintiff STEARNS, at all times relevant hereto, was an individual and a resident

23   of the State of California and purchased the Sleep Number® bed from Bed Bath & Beyond

24   (hereinafter "BBB") in or around the year 2000.  Defendant SELECT COMFORT knows the

25   exact date of the purchase.

26       19.  Plaintiff ROSE, at all times relevant hereto, was an individual and a resident of

27   the State of California and purchased the Sleep Number® bed from SELECT COMFORT's retail

28

Page 4

FIFTH AMENDED INDIVIDUAL COMPLAINT FOR: NEGLIGENCE; STRICT PRODUCTS LIABILITY; VIOLATION OF MAGNUSSON-MOSS WARRANTY ACT; BREACH OF EXPRESS WARRANTY; AND UNFAIR COMPETITION LAW

1 | store in or around the year 1996.  Defendant SELECT COMFORT knows the exact date of the
2 | purchase.

3 |     20.  Plaintiffs FULLER, at all times relevant hereto, were individuals and residents of
4 | the State of Florida and purchased the Sleep Number® bed from a SELECT COMFORT's retail
5 | store on May 17, 1996.

6 |     21.  Plaintiff DAN SCHLESINGER, at all times relevant hereto, was an individual and
7 | resident of the State of California and purchased the bed from SELECT COMFORT's telephone
8 | service center on November 2, 1994.

9 |     22.  Plaintiff KAREN WILLIAMS, at all times relevant hereto, was an individual and a
10 | resident of the State of California and purchased the Sleep Number® bed on February 10,
11 | 2004 from SLEEP TRAIN for her son BRYAN WILLIAMS.  Plaintiffs WILLIAMS were both
12 | present during the purchase of the Sleep Number® bed and defendants and each of them
13 | were aware that the bed purchase would be for the use of Defendant BRYAN WILLIAMS.
14 | Defendant dealt exclusively with KAREN WILLIAMS concerning the defective product.

15 |     23.  Plaintiff BRYAN WILLIAMS, at all times relevant hereto, was an individual and a
16 | resident of the State of California and began using the Sleep Number® bed on or around
17 | February 10, 2004. Plaintiffs WILLIAMS were both present during the purchase of the Sleep
18 | Number® bed and defendants and each of them were aware that the bed purchase would be
19 | for the use of Plaintiff BRYAN WILLIAMS.

20 |     24.  Plaintiffs are informed and believe and based thereon allege that defendant
21 | SELECT COMFORT, at all times relevant hereto, was a Minnesota corporation duly authorized
22 | to do business and doing business within the State of California and in all states of the United
23 | States of America with a principle place of business located at 9800 58th Avenue North,
24 | Minneapolis, Minnesota 55442.

25 |     25.  Plaintiffs are informed and believe and based thereon allege that defendant BBB,
26 | at all times relevant hereto, was a New York corporation duly authorized to do business and
27 | doing business in the State of California with a principle place of business located at 650

28 |

FIFTH AMENDED INDIVIDUAL COMPLAINT FOR: NEGLIGENCE; STRICT PRODUCTS LIABILITY; VIOLATION OF MAGNUSSON-MOSS WARRANTY ACT; BREACH OF EXPRESS WARRANTY; AND UNFAIR COMPETITION LAW

1  Liberty Avenue, Union, New Jersey 07083.

2      26.  Plaintiffs are informed and believe and based thereon allege that SLEEP TRAIN

3  at all times relevant hereto, was a California corporation duly authorized to do business and

4  doing business in the State of California with a principle place of business located at 8391

5  Auburn Boulevard, Citrus Heights, California 95610.

6      27.  Plaintiffs are informed and believe and based thereon allege that Defendants

7  BBB and SLEEP TRAIN were authorized and licensed retail distributors of products

8  manufactured by defendant SELECT COMFORT, including but not limited to, the Sleep

9  Number® bed.

10      28.  The true names and capacities, whether individual, corporate or otherwise of

11  defendant DOES 2 through 50,000, inclusive, are unknown to plaintiffs, who therefore sue said

12  defendants by said fictitious names.  Plaintiffs are informed and believe and thereon allege

13  that each defendant sued herein under a fictitious name is responsible in some manner for the

14  events and occurrences referred to herein.  When the true names, capacities, and

15  involvements of said defendants are ascertained, plaintiffs will seek leave to amend the

16  Complaint accordingly.

17      29.  Plaintiffs are informed and believe and thereon allege that at all times referred

18  to herein, each defendant, including DOES 2 through 50,000, inclusive, was the agent,

19  distributor, supplier, manufacturer, reseller, shipper, servant, employee, independent

20  contractor, consultant, or partner of each of the remaining defendants, and was acting within

21  the scope of that agency, employment, or relationship at all times relevant hereto.  Further,

22  the acts of defendants, and each of them, were ratified by said remaining defendants, and each

23  of them.

24                  **SUMMARY OF FACTUAL ALLEGATIONS**

25      30.  Plaintiffs are informed and believe and based thereon allege that beginning in

26  1987, defendant SELECT COMFORT commenced the design, manufacture, distribution and

27  sale of its Sleep Number® bed individually and through its licensees and retailers.  Each Sleep

28

1 | Number® bed has an express limited warranty provided directly through and administered
2 | by SELECT COMFORT.

3 |   31. Defendants, and each of them, created and implemented a uniform and
4 | comprehensive plan to market, advertise and promote the Sleep Number® bed which
5 | included, but was not limited to, a twenty (20) year express warranty – a period of time that is
6 | two to three times longer than the average life expectancy of a bed. The carefully orchestrated
7 | and uniform multi-media advertising campaigns used prime-time TV, national cable
8 | television, infomercials, nationally syndicated drive-time radio and newspapers; and used
9 | celebrities including, but not limited to, Lindsay Wagner, Paul Harvey, Rush Limbaugh, Sean
10 | Hannity, Delilah and nine (9) other spokespersons. Since 2002, the Sleep Number® bed by
11 | SELECT COMFORT has been a national sponsor of National Public Radio's Prairie Home
12 | Companion Show hosted by Garrison Keillor.

13 |   32. SELECT COMFORT also advertised and promoted its Sleep Number® bed by
14 | entering into agreements with Radisson Hotels & Resorts whereby each room would be
15 | furnished with Sleep Number® beds; providing Sleep Number® beds to Ronald McDonald
16 | House Charities, Fisher House Foundation and other health organizations; and entering into
17 | agreements with Winnebago Industries to install the Sleep Number® bed in motor homes.

18 |   33. SELECT COMFORT intended by the statements provided in its warranty and
19 | promotional information packet that the public at large would rely upon the information and
20 | statements. Said statements, more fully described hereinbelow, were uniformly broadcast
21 | and published to the general public and were emphasized when purchasing or inquiring about
22 | the product including affirmations through its express warranty that the Sleep Number® bed
23 | is safe and able to be repaired in the event of a <u>manufacturing defect</u>, including mold
24 | contamination and other hazardous material that becomes attached to the Sleep Number®
25 | bed and which is toxic and causes significant injury to humans when long term acute exposure
26 | is present on a daily basis.

27 |   34. SELECT COMFORT's advertising and promotional materials disclosed that the

28 |

1  product was not hazardous, was safe for human use, and <u>did not have any fundamental design</u>

2  <u>defects</u>.  However, the <u>defendants are unable to repair the design defect (which is more fully</u>

3  <u>described below) in question</u>.  Defendants' replacement policy is merely the replacement of a

4  moldy component with another clean component.  Each new component part immediately

5  begins anew the process of developing mold until another defective replacement is necessary,

6  all with the goal of outlasting the twenty (20) year warranty until no further service is

7  required.

8    35.  SELECT COMFORT's warranty and promotional information packet **do not**

9  provide for a refund within the terms of the warranty contract.  Defendant's warranty

10  contains express limitations for manufacturing defects.  It provides that a customer's

11  "<u>exclusive remedy</u>, in lieu of all incidental, special or consequential damages, including for

12  negligence, is limited to repair or replacement...Select Comfort will bear no other damages or

13  expenses." (Emphasis added).  This warranty is silent as to design defects and therefore has

14  no limitations on damages similar to the limitations for manufacturing defects.  As such, the

15  only warranty for design defects is that the bed will last for the 20 year warranty period.

16    36.  Defendants allegedly have a policy for handling customer's mold claims.

17  However, this warranty policy is insufficient in that it does not completely or adequately

18  compensate plaintiffs for losses and injuries they suffered.  Also, SELECT COMFORT

19  selectively enforces the terms of the warranty by attempting to impose the non-applicable

20  terms of the manufacturing defect limitations upon customers such as plaintiffs who

21  complaint about the design defect.  In general, defendants provide component replacements

22  unless a consumer has mold; provide refunds to customers in a selective manner which is

23  usually limited to those customers that complain and assert injury beyond the product itself;

24  and in some cases provides no relief at all.

25    37.  SELECT COMFORT advertised its Sleep Number® bed in the same manner

26  throughout the United States.  SELECT COMFORT provided a comprehensive training program

27  to its own customer service representatives, as well as the salespeople and representatives of

28

1   its authorized dealers including BBB, SLEEP TRAIN and DOE defendants, so that its

2   advertising and promotional claims, including its warranty terms would be uniformly

3   represented to potential and actual customers.

4        38. SELECT COMFORT sold its Sleep Number® bed directly to the general public

5   through retail stores, direct marketing, e-Commerce and wholesale through third-party

6   distributors/resellers.

7        39. SELECT COMFORT authorized BBB, SLEEP TRAIN and other authorized 3rd

8   parties unknown to plaintiffs, but known to it, and named herein as DOE defendants, to sell

9   and promote the Sleep Number® bed at retail stores.

10       40. Commencing at a date known only to defendants, but as early as 1996,

11   defendants received complaints specifically describing mold growing in the Sleep Number®

12   beds. Defendants became aware that significant numbers of customers were experiencing

13   mold growth within their beds. Defendants, upon learning of the serious nature of the mold

14   problem, resolved to address the product design defect through selective enforcement and

15   misinterpretation of its warranty in order to mitigate significant negative market

16   consequences and financial exposure while simultaneously refusing to provide notice to their

17   customers of this serious health issue.

18       41. The Sleep Number® bed's structure provides for a frame or foundation which

19   supports one or two air chambers (also known as bladders) which are separated and covered

20   by foam pieces (also known as inserts or toppers). These pieces together are enclosed by

21   another level of foam and a cover which completes the enclosure of what is the defectively

22   designed product. The bladders and foam toppers are hereinafter referred to as the internal

23   components. The bladders, described above, are no different than a common rubber air

24   mattress similar to those used in recreational camping. The only significant difference is that

25   the rubber bladder is covered in a canvas material which actually promotes mold growth as a

26   result of its porous nature. This canvas material and the foam components absorb moisture

27   which is collected on and around the bladder which is a piece of rubber or PVC sandwiched

28

between two pieces of canvas – designed to retain air so that the air pressure is constant and stable. The moisture combines with the heat generated by the users of the bed to create and an ideal environment for mold growth (incubation). The release of moisture by the users is ordinary and reasonably foreseeable and known to defendants and each of them.

42. While defendants have represented to plaintiffs that all <u>upholstered</u> products can grow mold, the Sleep Number® bed is not a fully upholstered product. In fact, what is marketed by defendants as the patented design is the encapsulated closed system that contains the non-permeable bladder which can be adjusted to an individual's personal needs. In order to hold the air, the bladder must necessarily be non-permeable – arguable not an upholstered product at all and is covered by what can only be described as a sponge. This creates the inherent design defect. The design which combines the specific component parts within the frame creates the design defect. Upholstered products have the ability for air to migrate throughout, thereby inhibiting the ability of the upholstered products to maintain a consistently wet and damp area. The Sleep Number® bed, as designed, prevents air migration and in fact collects and maintains moisture internally. Therefore, when moisture is collected on the bladder, through condensation or other means, it does not dry as it would with ventilated upholstered products. The moisture sits and accumulates upon the bladder surface and, in combination with the user's body heat, creates the perfect environment for mold incubation.

43. As a result of the Sleep Number® bed design with its encapsulated system, moisture from the human body collects on top of the bladder and is absorbed and stored in the foam padding which acts as a sponge. This condensation is caused, in part, by the different temperatures inside the air bladder and outside. In this moist, dark and damp environment, <u>mold spores are able to develop, attach to the porous outer surface of the bladder and the foam, and multiply</u>. Once the mold develops and attaches to the porous outer bladder and foam materials, these portions of the bed cannot be completely cleaned and thus mold continues to grow. Additionally, as the bed is used, contaminated air migrates from the

1  bladder, foam and contaminated mattress cover to the environment outside the bed as a

2  person, or other item, is placed on the bed condensing the foam and mattress topper.  The

3  contaminated air infects the surrounding bedding, including pillows, sheets, shams, mattress

4  pads, comforters and blankets as well as the ambient air coming to rest on furniture, walls,

5  floors, and any other item which may be located in the vicinity of the bed.  The mold is then

6  allowed to grow and further contaminate these independent and distinct products.  This mold

7  phenomenon has occurred consistently and in the same manner in thousands of Sleep

8  Number® beds sold by defendants.

9        44.  Media outlets and Select Comfort purchasers have provided photographic and

10  video footage describing and demonstrating the mold that is found inside the beds once

11  discovered.  One such example is a posting by an alleged Sleep Number purchaser which can

12  be found at http://www.youtube.com/watch?v=qKbMirg2a9U.  Plaintiffs' Sleep Number beds

13  exhibit identical damages as shown on the video provided above.  Attached hereto as **Exhibit**

14  **A** and incorporated by reference herein is a copy of the footage referenced above.

15        45.  Plaintiff STEARNS photographed her Sleep Number bed after finding mold.  Each

16  photograph depicts mold on the under side of the foam topper as well as the air chambers or

17  bladders.  Other plaintiffs' beds exhibit identical damages as shown on the photographs

18  provided herewith.  Attached hereto as **Exhibit B** and incorporated by reference herein is a

19  copy of the photographs taken of plaintiff STEARNS' mold laden bed.

20        46.  To further complicate matters, and as the attached photographs and video

21  demonstrate, although a mold inhibitor has allegedly been applied to component parts of the

22  bed, nothing has been done by SELECT COMFORT to address the design defect that allows for

23  the stagnant water and/or moisture to collect and remain within the distinct bed

24  components– resulting in mold attachment to these parts.  Defendants have provided

25  information through warranty materials dates after the time plaintiffs' purchased their beds

26  and through an online website which provides specific actions that may be taken to inhibit

27  mold growth in Sleep Number® beds.  Defendants have failed to notify those without the

28

1 newly-formulated canvas bladders of the danger posed to them and the need to air out their
2 bed by unzipping it and allowing any moisture to dry.

3     47. The Sleep Number® bed <u>design defect</u> has not changed during the period of
4 manufacture by SELECT COMFORT despite knowledge of the defective nature of the product.
5 The fact that SELECT COMFORT has seen fit to apply the "band-aid" of a mold inhibitor is
6 evidence of knowledge that the bed is defective and creates an environment for mold
7 incubation.

8     48. Any attempts by defendants to repair the beds by replacing the internal
9 components are futile absent some change in design. The reason these replacements are
10 futile is that regardless of how many times a replacement is made, no design modification has
11 occurred to limit moisture incubation or to allow for sufficient air into the sealed product.
12 Further, compelling users to pay for new parts under the warranty that will not remedy the
13 <u>design defect</u> is fundamentally unfair given defendants' knowledge that regardless of how
14 many new components are placed in the bed, the same result will occur given the defective
15 design. Plaintiffs have expended monies that they would not have expended were they
16 informed of the continual recurrence of mold and moisture and the futile nature of
17 replacements.

18     49. SELECT COMFORT has documentation in its care, custody and control that it has
19 received hundreds if not thousands of complaints regarding mold growth in the Sleep
20 Number® bed prior to and since 2004. Defendants themselves have acknowledged through
21 media reports and other corporate disclosures that thousands of customers have identified
22 mold and/or mildew associated with lack of respiration within their Sleep Number® beds.
23 Defendants' respond by claiming that only 1% of beds are replaced and that mold is rare.
24 These are false statements and the statistical reference to 1% is artificially low since it is only
25 based on those customers that fortuitously discover mold in their beds. Notwithstanding the
26 fact that 1% of their 5 million customers is 50,000 replaced beds
27 (http://www.selectcomfort.ca/aboutus/index.cfm?cm_re=nav-_-ln-_-company_info),

28

1  plaintiffs, and each of them, base their belief that this number is artificially low on the large

2  volume of complaints available through the internet (of which SELECT COMFORT responded),

3  other media reports, as well as defect and complaint acknowledgements provided to plaintiffs

4  by SELECT COMFORT customer service representatives

5  (http://www.consumeraffairs.com/furniture/select_mold.html ;

6  http://cbs5.com/wrapper_consumer/seenon/mold.bed.Select.2.727838.html ;

7  http://www.faqs.org/abstracts/Home-furnishings-industry/Select-Comfort-responds-to-

8  mold-reports-Forget-trendy-sleep-cures-lets-tout-a-new-mattress.html ;

9  http://cbs5.com/wrapper_consumer/seenon/Select.Comfort.mold.2.747124.html ;

10  http://www.emporiagazette.com/news/2009/apr/03/state_sen_chris_steineger_it_makes_se

11  nse_combine_i/ ; Carey v. Select Comfort,

12  http://kstp.com/news/stories/s4798.shtml?cat=17).  Additionally, the CEO, Bill McLaughlin

13  has stated publically that SELECT COMFORT has tried to keep these issues out of the public

14  eye so as not to harm business.  By SELECT COMFORT's own admissions therefore, the 1% is a

15  direct result of the actions of SELECT COMFORT's concerted efforts to keep complaints out of

16  the media and away from its customers.

17      50.  Plaintiff STEARNS first found mold in her bed on or around April 22, 2008 after

18  being informed by her plumber that he had heard about SELECT COMFORT beds containing

19  mold.

20      51.  Plaintiff ROSE first found mold in her bed on or around May 23, 2008 after

21  viewing a news story on her local television news program regarding this case that urged all

22  SELECT COMFORT customers to check their bed for mold.  Until this time, plaintiff ROSE was

23  never instructed by anyone, including defendants, concerning the potential for mold.

24      52.  Plaintiffs FULLER first found mold in their bed on or around June 16, 2008 while

25  in the process of checking their mattress for mold based on their doctor's suggestion in

26  response to Mr. Fuller's recurring skin allergy he developed while sleeping in his bed.

27      53.  Plaintiff SCHLESINGER first found mold in his bed on September 23, 2004 while

28

1  in the process of realigning the air chambers. Plaintiff SCHLESINGER was provided

2  replacement parts and assurances by SELECT COMFORT that the bed would not continue to

3  have mold. Plaintiff SCHLESINGER again found mold on August 11, 2008 while in the process

4  of checking the bed.

5       54. Plaintiffs KAREN WILLIAMS and BRYAN WILLIAMS first found mold in BRYAN

6  WILLIAMS bed on October 26, 2006 and December 30, 2006 while in the process of inspecting

7  the bed for mold growth as instructed by SELECT COMFORT in their new product manual and

8  at the urging of toxicologist.

9       55. When plaintiff ROSE called to complain to SELECT COMFORT of mold on May 23,

10  2008, she was informed by the Customer Service Representative that SELECT COMFORT was

11  aware of the mold problem but that SELECT COMFORT changed the <u>design</u> in 2005 to address

12  the problem. This statement is untrue in that the <u>design has never been changed</u>. ROSE

13  offered SELECT COMFORT the opportunity to cure the defect and defendants' refused.

14  SELECT COMFORT refused when it <u>would not guarantee,</u> under the terms of the warranty,

15  <u>that a design defect was not present and that post 2005 beds would not incubate mold.</u>

16       56. Plaintiff ROSE was provided a refund, but was not compensated for the property

17  damage she sustained or for costs associated with replacing the defective products which she

18  requested.

19       57. When plaintiffs FULLER called the SELECT COMFORT Customer Service

20  Representative regarding mold in their bed in 2008, they were informed that SELECT

21  COMFORT was aware of the problem and made changes in the <u>design</u> in 2005 specifically in

22  response to consumer complaints. This statement is untrue in that the <u>design has never been</u>

23  <u>changed</u>.

24       58. Plaintiffs FULLER were provided a refund, but were not compensated for

25  property damage they sustained or for costs associated with replacing the defective products

26  which they requested.

27       59. Plaintiff KAREN WILLIAMS complained to SELECT COMFORT, via the toll free

28

FIFTH AMENDED INDIVIDUAL COMPLAINT FOR: NEGLIGENCE; STRICT PRODUCTS LIABILITY; VIOLATION OF MAGNUSSON-MOSS WARRANTY ACT; BREACH OF EXPRESS
WARRANTY; AND UNFAIR COMPETITION LAW

1   number provided in the documents provided by SELECT COMFORT. Plaintiff KAREN

2   WILLIAMS first called SELECT COMFORT regarding mold in her son's bed in 2006 and 2007.

3   SELECT COMFORT sent new foam and replacement parts to BRYAN WILLIAMS, the user of the

4   bed. These new parts also developed mold. Around the same time, KAREN WILLIAMS also

5   called and reported mold to SELECT COMFORT and SLEEP TRAIN after the new parts began to

6   develop mold, mildew and wetness.

7          60.  Plaintiff KAREN WILLIAMS communicated by U.S. Mail, return receipt requested,

8   to Lisa Riedesel and CEO Bill McLaughlin of SELECT COMFORT on May 14, 2007 and advised

9   SELECT COMFORT of the mold issues involving the bed she purchased for her son and the

10  need for a recall notice to be sent out to all those with Sleep Number® Beds. Plaintiff KAREN

11  WILLIAMS' letter also documented several telephone calls with SELECT COMFORT

12  representatives whereby SELECT COMFORT representatives admitted that KAREN

13  WILLIAMS' request that a recall and notice to all members of the consumers had been

14  documented and provided to the customer service representative's superiors. On May 29,

15  2007 KAREN WILLIAMS received a phone call acknowledging that SELECT COMFORT had

16  received her letter. Subsequently on June 1; June 6; and June 21, 2007 SELECT COMFORT

17  requested and received documents from KAREN WILLIAMS relating to damages suffered by

18  BRYAN WILLIAMS and his property. Attached hereto as **Exhibit C** is a true and correct copy

19  of the letter sent by KAREN WILLIAMS referenced above as well as return receipt

20  confirmations signed by SELECT COMFORT agents and/or employees.

21         61.  On July 3, 2007, KAREN WILLIAMS was contacted by SELECT COMFORT

22  representative Lisa Riedesel via telephone to confirm whether she would remedy the

23  property damage and injuries to BRYAN WILLIAMS and issue a recall or other notification to

24  consumers.

25         62.  Plaintiff KAREN WILLIAMS requested in writing a refund and reimbursement for

26  all expenses related to the moldy bed, an amount which equaled approximately $32,000.00.

27  This demand was rejected and plaintiff KAREN WILLIAMS has not received a refund or

28

1 reimbursement for property damage she sustained as of the date of this amended complaint.

2       63. Plaintiff DAN SCHLESINGER first called SELECT COMFORT, via the toll free

3 number, regarding mold in his bed in 2003 and spoke with a SELECT COMFORT

4 representative identified solely as SARAH.  In his communication, SELECT COMFORT admitted

5 that some beds do develop mold and/or mildew and offered to send new foam and

6 replacement parts to SCHLESINGER.  SCHLESINGER was sent replacement parts on two

7 separate occasions, each of which developed mold similar in character to the original mold

8 manifestations.

9       64. Plaintiff SCHLESINGER requested a refund and reimbursement for all expenses

10 and property damage he sustained related to the moldy bed.  This demand went unanswered

11 and plaintiff SCHLESINGER has not received a refund or reimbursement as of the date of this

12 amended complaint.

13       65. Plaintiff MOLLY STEARNS contacted SELECT COMFORT customer service on

14 April 22, 2008.  Customer Service Representatives told plaintiff STEARNS that the product

15 was _redesigned_ in 2005 to inhibit mold growth in response to complaints made to SELECT

16 COMFORT.  This statement is untrue in that the _design has never been changed_.

17       66. Plaintiff STEARNS did not request a refund, but was told by the customer service

18 representative that SELECT COMFORT would refund $1,980.94.  STEARNS refused the refund.

19 Subsequently STEARNS received a check from SELECT COMFORT for $1,894.35 with no

20 explanation as to what that amount represented.  STEARNS was not compensated for the

21 entire bed purchase price, the property damage she sustained or for costs associated with

22 replacing the defective bed.

23       67. Defendants, and each of them, were on notice of the bed's defective design based

24 on the complaints by the abovementioned plaintiffs, as well as the complaints of mold and

25 replacement part mold featured in the media through television news reports and print

26 media, including the internet. The vast majority of these complaints are indisputably

27 legitimate since SELECT COMFORT representatives responded to these complaints by

28

1   admitting knowledge of a history of mold problems. Documents supporting defendants

2   knowledge are in the care, custody and control of SELECT COMFORT.

3       68. As a result of said complaints, SELECT COMFORT continuously sent replacement

4   beds and replacement component parts to consumers complaining of mold. Defendants were

5   subsequently notified on multiple occasions, by the same consumers, that replacement parts

6   and beds also incubated mold, thus making any replacement futile and without purpose.

7   Defendants have spent substantial amounts on refunds and replacement costs since notice

8   was provided to SELECT COMFORT of the inherent design defect.

9       69. At some point in time, known only to defendants, and each of them, but not to

10  plaintiffs, defendants became aware that the Sleep Number® bed was inherently defective as

11  designed; replacement parts would not resolve the problem; and the design defects was

12  outside the terms of the express limited warranty, or alternatively the warranty being silent

13  on design defects did not limit plaintiffs' remedies. At that point, defendants had an obligation

14  to notify the public that their beds incubate mold and were defectively designed. Defendants

15  were aware through internal information that the beds were inherently defective and that

16  they were unable to repair the defects and unwilling to pay for reimbursement of other

17  property damages and costs. Notwithstanding this knowledge, defendants continued to

18  attempt to use the limited warranty to shield them from liability.

19      70. Defendants, and each of them, knew that the only way in which a customer

20  would be alerted to the presence of mold was by unzipping and taking apart the Sleep

21  Number® bed. Defendants, and each of them, made a strategic decision not to provide notice

22  to its customers and the public at large to inspect their beds for mold.

23      71. After becoming aware of the inherent design defect of the Sleep Number® bed,

24  defendants, and each of them failed, and continue to fail, to warn its customers and users of

25  the inherent design defect. Defendants have a duty to disclose to all customers and users that

26  they should inspect their beds for mold; that replacement parts will not remedy the design

27  defect; and/or a refund should be obtained from SELECT COMFORT.

28

1    72. After becoming aware of the <u>inherent design defect</u> of the Sleep Number® bed,

2   defendants, and each of them failed, and continue to fail, to recall the beds or otherwise

3   provide notice to purchasers and users of the <u>inherent defectively designed product</u>.

4   Defendants have a duty to recall the beds or otherwise notify past purchasers of the potential

5   damage.

6    73. Admitting knowledge of the mold problems with the beds, on September 6, 2004

7   in an article featured in *Furniture/Today*, SELECT COMFORT CEO Bill McLaughlin stated, "We

8   [SELECT COMFORT] have intentionally been selective, rather than broad, in our public

9   communication on the issue [mold reports] because we believe it is better for the mattress

10   industry and ourselves not to keep this topic in the headlines, causing unnecessary concern

11   for consumers." McLaughlin also issued an appeal to the mattress industry to avoid engaging

12   in a debate about whether certain types of beds are more likely to encounter mold problems.

13    74. On or around 2005, after only two complaints were made to SELECT COMFORT

14   of defective component parts, including, but not limited to air pumps, SELECT COMFORT

15   notified its consumers and recalled the allegedly defective product and contacted all

16   registered owners regarding this air pump problem. Defendants have not issued a recall of

17   the beds in the present situation because the pump was defectively manufactured and a

18   known number of defective pumps were manufactured. In this instance, the bed itself is

19   <u>defectively designed</u> – a significantly broader problem for which exposure to damages is much

20   more significant and unknown. <u>The delivery of new parts is futile in the present case since the</u>

21   <u>design itself is defective and the replacement parts will not remedy the fundamental design</u>

22   <u>defect.</u>

23    75. To address the current defect, instead of issuing a recall or notifying consumers

24   of the inherently defective nature of the Sleep Number® bed, SELECT COMFORT instituted a

25   policy to unilaterally modify and/or improperly apply the warranty terms for any person who

26   called and consistently complained of mold and/or personal injuries. The <u>limited warranty is</u>

27   <u>silent as to design defects</u> and SELECT COMFORT does not as a matter of course offer a refund

28

1   to every consumer complaining of mold. In addition, the SELECT COMFORT response policy

2   mandated that the moldy beds be returned to it. The cost for shipping was to be borne by the

3   consumer. Plaintiffs have paid costs for shipping replacement parts and defective beds on

4   multiple occasions despite SELECT COMFORT's knowledge that the design is defective and

5   these requirements are not part of any express warranty for a design defect.

6        76.  In lieu of issuing a recall or notifying consumers of the inherently defective

7   nature of the Sleep Number® bed, SELECT COMFORT also consulted with and employed

8   several marketing, public relations and media relations experts, including Ogilvy PR,

9   Carmichael Lynch and Spong, and others unknown to the plaintiffs, to institute an aggressive

10   campaign to combat the complaints being waged by consumers complaining of mold. This

11   campaign included the misrepresentation of the condition of the Sleep Number® bed and the

12   intentional communication to only those consumers who themselves contacted SELECT

13   COMFORT regarding the mold in beds.

14        77.  Defendants, and each of them, instituted a standardized training program for all

15   employees of said defendants that included a script of what was to be said to prospective

16   purchasers upon inquiry regarding the Sleep Number® bed, as well as what was to be said to

17   those purchasers that complained either through the internet, customer service or otherwise,

18   about mold growth in the Sleep Number® bed. The same message regarding the Sleep

19   Number® bed and mold growth was issued to all plaintiffs whom relied on these

20   representations when contacting the defendants, and each of them, regarding the defective

21   product.

22        78.  Statements provided to each plaintiff and consumers, upon notification of mold,

23   included the following:

24            **"Select Comfort does not offer refunds or damages for property; you are**

25            **required to accept replacement parts." Defendants offer refunds on a**

26            **selective basis and only in cases where litigation may result and do not**

27            **offer reimbursement for damages.**

28

**"Select Comfort is not aware of any cases of mold since its reformulation."**
**This statement is false. KAREN Williams was issued reformulated bed that**
**incubated mold and she reported such to Select Comfort.**

**"We can only provide you replacement parts, but cannot guarantee that**
**the replacement parts will be mold free."**

**"Mold is not something to be concerned with and can be cleaned with a**
**simple bleach solution."**

**"All upholstered products develop mold."**

79. In or around 2005, SELECT COMFORT applied a new mold inhibiting agent to the Sleep Number® bed ostensibly to remedy the continuing problems associated with the development of mold within the product. Knowing that the Sleep Number® beds posed such a hazard that additional inhibitors were required, defendants chose not to redesign the product to address the moist and mold friendly environment. They also chose not to notify all customers with pre-reformulation beds of the existing hazards. By their own admission, the internal components, were not changed in 2005. Only the mattress cover received an inhibitor to prevent users from knowing that their bed was contaminated (i.e. the contamination on the bladders would not be able to travel as easily to the surface thereby extending the time before detection). Further, this inhibitor in no way addressed the millions of beds already in service and the defective design which is the root cause of the mold.

80. SELECT COMFORT received numerous complaints before and after it changed the product material at some point in 2005 regarding mold that continues to grow within the Sleep Number® bed as a result of the inability of bed to breathe and allow for moisture to escape. Defendants aware of the design defect have sent out replacement parts with the new mold inhibitors and have been notified of continued mold growth in beds and replacement parts. Defendants, and each of them, are aware that the Sleep Number® bed has an inherent design defect based on the prior complaints that gave rise to the application of mold inhibitors; and based on the subsequent complaints that have been received by their customer

1  service representatives regarding newly purchased beds and replacements parts. Defendants

2  have documents in their care, custody and control regarding complaints made by customers,

3  including, but not limited to written correspondence from customers, notes of telephone calls

4  by Customer Service Representatives, and telephone recordings of customers making

5  complaints.

6       81. Defendants, and each of them, have consistently misrepresented since as late as

7  2004 that they have not received any complaints of mold, confirmed any cases of mold or

8  been put on notice of mold since the 2005 changes to the Sleep Number® bed and that cases

9  of mold in the Sleep Number bed are rare. Defendants are aware that these statements are all

10  false and are directly contradicted by SELECT COMFORT's own company records. (*See, URL's*

11  *identified supra*). Defendants make these statements in an effort to prevent further costs for

12  replacement, refunds and/or damages.

13       82. SELECT COMFORT has publicly stated that "there have been 0 confirmed cases of

14  mold in a Sleep Number® bed sold after the antimicrobial reformulation in 2005."

15  Defendants are aware that these statements are all false and are directly contradicted by

16  SELECT COMFORT's own company records. In fact, plaintiffs have obtained replacement parts

17  since the 2005 reformulation and the results are identical-mold incubation in the internal

18  components. Plaintiffs SCHLESINGER, ROSE, and WILLIAMS have each told SELECT COMFORT

19  that mold growth has occurred in their <u>beds on parts that post-date the 2005 reformulation</u>.

20       83. The express Limited Warranty, which is silent as to design defects and therefore

21  the limitations contained therein do not apply, provides for a scale reduction in replacement

22  price based on the number of years since the original date of purchase. SELECT COMFORT's

23  policy of making payments to customers as applied to plaintiffs STEARNS, ROSE and FULLER,

24  for beds experiencing mold growth is meant not only to prevent customers from seeking all

25  the relief to which they are entitled by forcing the inapplicable damage limitation upon them,

26  but also to prevent dissemination of information and avoid being compelled to provide notice

27  and take action relative to all SELECT COMFORT customers. Defendants' policy does not

28

1  adequately account for reimbursement for all damage suffered by plaintiffs. Plaintiffs each

2  suffered physical property damage, as more fully described herein. To this date, SELECT

3  COMFORT has refused to reimburse or in any way rectify or make plaintiffs whole for their

4  lost property and money or to redesign the bed to address the mold incubation problems.

5       84.  Although SELECT COMFORT claims to offer several options to customers who

6  identify mold in their bed including replacing components of the bed, replacing the entire bed,

7  or even providing a full refund—all at no charge to the customer, defendants do not provide

8  this information to the consumer in writing, do not provide refunds upon request and assert

9  that no such refund is available to consumers when contacted and through publicly

10  disseminated statements. Further, their own website claims that although mold is rare, they

11  will remedy the situation. They do not state that they will provide a refund as described more

12  fully above. This is supported by recent statements attributable to CEO Bill McLaughlin in

13  response to this litigation posted on Youtube.

14       85.  Defendants do not provide information to consumers regarding what to do in

15  case mold is found. Defendants do provide a "mattress care" section on their website. As late

16  as 2003, this section contained no information concerning mold. However, around the same

17  time as the inclusion of mold inhibitors (2005), defendants altered this website to include

18  information on how mold is rare and to contact Select Comfort if mold is found. Defendants

19  did not send these new "mattress care" guidelines to all existing customers who purchased

20  and/or used beds prior to this date and placed it [on an obscure portion of their website].

21  This heading is currently found under the website's "research" heading, instead of the

22  "Frequently Asked Questions" heading. Defendants have documentation in their care, custody

23  and control as to when and what changes were made to the website and marketing materials.

24       86.  Plaintiffs have each discovered mold in their respective Sleep Number® beds

25  and have removed and/or replaced the bed from their homes as part of their duty to mitigate.

26  Each plaintiff named herein has purchased replacement bedding and expended money that

27  they would not otherwise have spent were it not for the mold that contaminated and

28

1   destroyed plaintiffs' property.  Plaintiffs have suffered actual physical property damage in the

2   form of replacement bedding which includes, sheets, pillows, shams, bed skirts, comforters

3   and blankets. ("replacement bedding").  The resulting property damage is independent of the

4   defective products themselves.

5        87.  Plaintiffs have each paid the cost of shipping and handling to SELECT COMFORT

6   as a means of obtaining the original bed and the replacement parts, despite the fact that

7   SELECT COMFORT was aware, prior to and subsequent to entering into contract with

8   plaintiffs, that the replacement parts were defective and, that they would in no way be willing

9   to repair the design defect.  The sole purpose behind replacement parts was to delay the mold

10  incubation process and obtain more monies from new customers and existing customers

11  through replacement costs similar to a ponzi scheme. Plaintiffs were forced to expend monies

12  for shipping and handling that they would not have otherwise spent were it not for

13  defendants' defective design.

14       88.  As a result of the defendants' misconduct, and each of them, plaintiffs have each

15  paid the cost of replacement bedding and shipping costs of either replacement products or

16  mold infected products that they would not otherwise have spent were it not for defendants'

17  defective product.

18                          **FIRST CAUSE OF ACTION**

19                                **NEGLIGENCE**

20                   **(Plaintiffs individually v. ALL DEFENDANTS)**

21       89.  Plaintiffs hereby adopt and incorporate by reference all allegations set forth

22  above as though set forth fully herein.

23       90.  At all times herein mentioned, defendants, and each of them, had a duty to

24  properly manufacture, design, compound, test, inspect, package, label, distribute and market

25  the Sleep Number® bed.

26       91.  At all times herein mentioned, defendants, and each of them, knew, or in the

27  exercise of reasonable care should have known, that the Sleep Number® bed was a consumer

28

1   product of such a nature that if it was not properly manufactured, designed, tested, inspected,

2   packaged, labeled, distributed and marketed for the use and purpose for which it was

3   intended, it was likely to injure those person(s) by whom it was used.

4       92.  The express Limited Warranty does not provide for any refund and defendants

5   have refused to grant a refund and damage amounts to plaintiffs WILLIAMS and

6   SCHLESINGER despite requests to do so and have failed to provide a full refund to plaintiff

7   STEARNS despite their representation to the contrary.  Defendants also required plaintiffs to

8   accept replacement parts in lieu of a refund.  Plaintiffs WILLIAMS and plaintiff SCHLESINGER

9   purchased new mattresses and foundations to replace the Sleep Number bed by SELECT

10  COMFORT that was defectively designed and for which no refund has been provided.

11  Plaintiffs were forced to expend monies that they would not have otherwise spent were it not

12  for defendants' defectively designed product.

13      93.  Defendants, and each of them, so negligently and carelessly manufactured,

14  designed, tested, inspected, packaged, labeled, distributed, recommended, displayed and sold

15  the Sleep Number® bed that the same was defective, contaminated, and dangerous product,

16  and unsafe for the use and purpose for which it was intended when used and applied as

17  recommended by defendants, and each of them, thereby breaching their duty to plaintiffs.

18      94.  Plaintiffs began using the Sleep Number® bed for the purpose for which it was

19  intended to be used, namely for sleeping on and laying on for rest.

20      95.  SELECT COMFORT's Sleep Number bed was defectively designed when it left

21  defendant's control and entered the market because the design cannot be corrected.  The

22  defects were not open and/or obvious to consumers.

23      96.  Defendants, and each of them, were in the chain of custody and placed the

24  defective beds in the stream of commerce.  Each defendant, was involved in the manufacture,

25  distribution, sale, shipping and/or production of the defectively designed beds.

26      97.  Consumers became aware of mold spores and mold incubation only after by

27  chance unzipping and taking apart the Sleep Number bed.  Defendants at no time provided

28

written instructions to plaintiffs to monitor the internal components or to provide

maintenance to the internal components of the product.  Defendants did not subsequently

identify to consumers that beds existing prior to reformulation required ventilation on a

consistent basis.  Beds manufactured prior to the reformulation contain no explanation of

maintenance and ventilation and rather, identify that the beds are maintenance free.

98.  Because of the aforementioned negligence of the defendants, and each of them,

in the manufacture, design, testing, inspection, packaging, labeling, distribution,

recommendation, display and sale of said product, the plaintiff's Sleep Number® bed

developed and incubated mold contamination resulting in damages to the plaintiffs.

99.  The sole purpose behind replacement parts was to delay the mold incubation

process and obtain more monies from new customers and existing customers through

replacement costs similar to a ponzi scheme.   The replacement parts and moneys expended

therefore do not alleviate the defect present in the manufacture, design, testing, inspection,

packaging, labeling, distribution, recommendation, display and sale of said product.

100.The Sleep Number bed by SELECT COMFORT exhibits design defects that cannot

be corrected by reformulation of materials or replacement of component parts.  Further, the

Sleep Number bed is significantly different from other mattresses in that wetness and other

liquids (that commonly and foreseeably result from daily use of the product) which foster

mold have no way of escaping given the design of the Sleep Number bed.  The only way in

which defendants could conceivably correct the harm caused to plaintiffs would be to

redesign the bed so that air can travel through the bed and moisture cannot remain stagnant.

Defendants, despite the knowledge of the design defect, have chosen not to do so.

101.**Plaintiffs have suffered the following personal injury damages as alleged**

**hereinbelow**:

102.As a direct and proximate result of the negligence of the defendants, and each of

them, plaintiffs suffered grievous personal injuries to their pulmonary system including

allergies, asthma and other pulmonary distress; and to their skin in the form of an allergic

reaction. The full nature and extent of said injuries are not known to plaintiffs and leave is requested to amend this complaint to conform to proof at time of trial; plaintiff is informed and believes and based thereon alleges that said injuries are permanent and by reason of the foregoing. Each plaintiff suffered injuries and received treatment as a result of defendants product as follows:

a. MOLLY STEARNS suffered various injuries, including but not limited to, lung and pulmonary distress, lung biopsy and other lung related treatment.

MOLLY STEARNS paid for medical expenses related to the injuries caused by the exposure to mold through the defective Sleep Number Bed. The medical expenses for injuries related to the exposure to mold are in excess of seventy thousand dollars ($70,000.00). MOLLY STEARNS would not have paid for these costs were it not for the actions of defendants as alleged herein more fully.

b. DENNIS FULLER suffered various injuries, including but not limited to skin irritation, blemishes and other skin infection treatment.

DENNIS FULLER paid for medical expenses related to the injuries caused by the exposure to mold through the defective Sleep Number Bed. The medical expenses for injuries related to the exposure to mold would not have been paid were it not for the actions of defendants as alleged herein more fully.

c. BONNIE FULLER suffered various injuries, including but not limited to nasal, pulmonary distress and other lung related treatment.

BONNIE FULLER paid for medical expenses related to the injuries caused by the exposure to mold through the defective Sleep Number Bed. The medical expenses for injuries related to the exposure to mold would not have paid were it not for the actions of defendants

1    as alleged herein more fully.

2          d.   RUTH ROSE suffered various injuries, including but not limited to skin,

3    pulmonary distress and other lung related treatment.

4          RUTH ROSE paid for medical expenses related to the injuries caused by the

5

6    exposure to mold through the defective Sleep Number Bed. The medical expenses for injuries

7    related to the exposure to mold would not have paid were it not for the actions of defendants

8    as alleged herein more fully.

9          e.   DAN SCHLESINGER suffered various injuries, including but not limited to

10   skin, pulmonary distress and other lung related treatment.

11

12         DAN SCHLESINGER paid for medical expenses related to the injuries caused by

13   the exposure to mold through the defective Sleep Number Bed. The medical expenses for

14   injuries related to the exposure to mold would not have paid were it not for the actions of

15   defendants as alleged herein more fully.

16         f.   BRYAN WILLIAMS suffered various injuries, including but not limited to lung

17   and pulmonary distress, lung biopsy and other lung related treatment,

18

19         BRYAN WILLIAMS paid for medical expenses related to the injuries caused by

20   the exposure to mold through the defective Sleep Number Bed.  The medical expenses for

21   injuries related to the exposure to mold would not have paid were it not for the actions of

22   defendants as alleged herein more fully.

23         103. As further proximate result of the negligence of the defendants, and each of

24   them, plaintiffs have paid for checkups, medication, diagnostic testing, biopsies, medical,

25   surgical, and other related expenses.

26

27         104. As further proximate result of the negligence of the defendants, and each of

28

them, plaintiffs will be forced to pay future medication, medical, surgical and other related expenses the full nature and extent and amount of which are not yet known to plaintiffs, and leave is requested to amend this Complaint to conform to proof at the time of trial.

105.As further proximate result of the negligence of the defendants, and each of them, plaintiffs have lost income, wages, and other pecuniary losses, the full nature and extent of which is not yet known to plaintiffs, and leave is requested to amend this Complaint to conform to proof at time of trial.

106.Plaintiffs are informed and believe, and based thereon allege, that defendants, and each of them, have recklessly caused great harm to plaintiffs with full knowledge of the recklessness of their conduct.  Plaintiffs are further informed and believe, and based thereon allege, that defendants' conduct as alleged above was despicable, was carried on with a reckless  disregard of plaintiffs' rights, and subjected plaintiffs to undue hardship.  Therefore, plaintiffs should be awarded punitive and exemplary damages sufficient to punish defendants for engaging in this conduct and to deter similar conduct on their part in the future.

WHEREFORE, plaintiffs pray for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY

### (Plaintiffs individually v. ALL DEFENDANTS)

107.Plaintiffs hereby adopt and incorporate by reference all allegations set forth above as though set forth fully herein.

108. Defendants, and each of them, had a duty to warn plaintiffs of the inherent defect in the product.  The inclusion of a warning or instructions on maintenance of the internal component parts would be of minimal cost to SELECT COMFORT as compared to the benefit to all consumers.

109.At all times herein mentioned, defendants, and each of them, knew, or in the exercise of reasonable care should have known, that the Sleep Number® bed was a consumer

1   product of such a nature that if it was not properly manufactured, designed, tested, inspected,

2   packaged, labeled, distributed and marketed for the use and purpose for which it was

3   intended, it was likely to injure those person(s) by whom it was used.

4       110.The express Limited Warranty does not provide for any refund and defendants

5   have refused to grant a refund and damage amounts to plaintiffs WILLIAMS and

6   SCHLESINGER despite requests to do so and have failed to provide a full refund to plaintiff

7   STEARNS despite their representation to the contrary. Defendants required plaintiffs to

8   accept replacement parts in lieu of a refund. Plaintiffs WILLIAMS and plaintiff SCHLESINGER

9   purchased new mattresses and foundations to replace the Sleep Number bed by SELECT

10   COMFORT that was defective and for which no refund has been provided. All plaintiffs were

11   forced to expend monies that they would not have otherwise spent were it not for defendants'

12   defective product.

13       111.The Sleep Number® bed design is inherently defective in that it is an

14   encapsulated closed system that is not air permeable. The materials used in the manufacturer

15   of the Sleep Number® bed are also defective in that they do not breathe adequately which

16   leads to moisture collecting on the internal components of the bed. The mold spores multiply

17   on the internal components since the environment for fungus as a result of the design and

18   manufacture defects is ideal – dark, moist and damp.

19       112.At all times relevant hereto defendant SELECT COMFORT was the designer,

20   manufacturer, wholesaler and retailer of the Sleep Number® bed.

21       113.At all times relevant hereto defendant BBB and SLEEP TRAIN were retailers of

22   the Sleep Number® bed.

23       114.Plaintiff is informed and believes and based thereon alleges that defendants

24   Does 2 through 50,000 were either designers, material suppliers, distributors, manufacturers,

25   wholesalers and/or retailers of the Sleep Number® bed.

26       115.Defendants, and each of them placed the Sleep Number® bed into the stream of

27   commerce.

28

116. As a direct and proximate result of the design and manufacture of the Sleep Number® bed, the product was defective when it was sold and delivered to plaintiffs.

117. Plaintiffs are informed and believe and based thereon allege that some time in 1996 and again in 2005, SELECT COMFORT changed or otherwise altered the Sleep Number® bed to address the mold infestation issues by putting mold inhibitors in its product. Further information is more easily accessible through the defendants and each of their research and development and customer service departments.

118. At no time prior to the discovery of mold in their Sleep Number® beds, did SELECT COMFORT notify any of the plaintiffs that their beds were inherently defective, and subject to mold infestation from normal use and potentially hazardous to their health.

119. SELECT COMFORT did not notify plaintiffs that the product was inherently defective, and subject to mold infestation from normal use and that SELECT COMFORT could not repair the defect with replacement components absent a full redesign of the bed.

120. It is not reasonably foreseeable for plaintiffs to expect that their Sleep Number® bed would develop mold from normal use.

121. Defendants, and each of them, had a duty to warn plaintiffs of the inherent defect in the product.

122. Defendants, and each of them, breached this duty to warn, thereby exposing plaintiffs to additional damages.

123. The cost to redesign the product does not outweigh the harm and damages to plaintiffs.

124. The sole purpose behind replacement parts was to delay the mold incubation process and obtain more monies from new customers and existing customers through replacement costs similar to a ponzi scheme.

125. The Sleep Number bed by SELECT COMFORT exhibits design defects that cannot be corrected by reformulation of materials or replacement of component parts. Further, the Sleep Number bed is significantly different from other mattresses in that wetness

1   and other liquids which foster mold have no way of escaping given the design of the Sleep

2   Number bed.  The only way in which defendants could conceivably correct the harm caused to

3   plaintiffs would be to redesign the bed so that air can travel through the bed and moisture

4   cannot remain stagnant.  Defendants, despite the knowledge of the design defect, have chosen

5   not to do so.

6       126.   **Plaintiffs have suffered the following personal injury damages as**

7   **alleged hereinbelow**:

8       127.   As a direct and proximate result of the negligence of the defendants, and

9   each of them, plaintiffs suffered grievous personal injuries to their pulmonary system

10  including allergies, asthma and other pulmonary distress; and to their skin in the form of an

11  allergic reaction.  The full nature and extent of said injuries are not known to plaintiffs and

12  leave is requested to amend this complaint to conform to proof at time of trial; plaintiff is

13  informed and believes and based thereon alleges that said injuries are permanent and by

14  reason of the foregoing.  Each plaintiff suffered injuries and received treatment as a result of

15

16  defendants product as follows:

17      a.   MOLLY STEARNS suffered various injuries, including but not limited to,

18  lung and pulmonary distress, lung biopsy and other lung related treatment.

19      MOLLY STEARNS paid for medical expenses related to the injuries caused by the

20  exposure to mold through the defective Sleep Number Bed.  The medical expenses for injuries

21

22  related to the exposure to mold are in excess of seventy thousand dollars ($70,000.00).

23  MOLLY STEARNS would not have paid for these costs were it not for the actions of defendants

24  as alleged herein more fully.

25      b.   DENNIS FULLER suffered various injuries, including but not limited to skin

26  irritation, blemishes and other skin infection treatment.

27

28

FIFTH AMENDED INDIVIDUAL COMPLAINT FOR: NEGLIGENCE; STRICT PRODUCTS LIABILITY; VIOLATION OF MAGNUSSON-MOSS WARRANTY ACT; BREACH OF EXPRESS WARRANTY; AND UNFAIR COMPETITION LAW

1    DENNIS FULLER paid for medical expenses related to the injuries caused by the

2    exposure to mold through the defective Sleep Number Bed. The medical expenses for injuries

3    related to the exposure to mold would not have paid were it not for the actions of defendants

4    as alleged herein more fully.

5

6        c.   BONNIE FULLER suffered various injuries, including but not limited to

7    nasal, pulmonary distress and other lung related treatment.

8        BONNIE FULLER paid for medical expenses related to the injuries caused by the

9    exposure to mold through the defective Sleep Number Bed. The medical expenses for injuries

10   related to the exposure to mold would not have paid were it not for the actions of defendants

11   as alleged herein more fully.

12

13       d.   RUTH ROSE suffered various injuries, including but not limited to skin,

14   pulmonary distress and other lung related treatment.

15       RUTH ROSE paid for medical expenses related to the injuries caused by the

16   exposure to mold through the defective Sleep Number Bed. T The medical expenses for

17   injuries related to the exposure to mold would not have paid were it not for the actions of

18   defendants as alleged herein more fully.

19

20       e.   DAN SCHLESINGER suffered various injuries, including but not limited to

21   skin, pulmonary distress and other lung related treatment.

22       DAN SCHLESINGER paid for medical expenses related to the injuries caused by

23   the exposure to mold through the defective Sleep Number Bed. The medical expenses for

24   injuries related to the exposure to mold would not have paid were it not for the actions of

25   defendants as alleged herein more fully.

26

27       f.   BRYAN WILLIAMS suffered various injuries, including but not limited to lung

28

1    and pulmonary distress, lung biopsy and other lung related treatment.

2              BRYAN WILLIAMS paid for medical expenses related to the injuries caused by

3    the exposure to mold through the defective Sleep Number Bed.  The medical expenses for

4
     injuries related to the exposure to mold would not have paid were it not for the actions of
5
6    defendants as alleged herein more fully.

7              128.    As further proximate result of the negligence of the defendants, and each of

8    them, plaintiffs have paid for checkups, medication, diagnostic testing, biopsies, medical,

9    surgical, and other related expenses.

10             129.  As further proximate result of the negligence of the defendants, and each of
11
     them, plaintiffs will be forced to pay future medication, medical, surgical and other related
12
13   expenses the full nature and extent and amount of which are not yet known to plaintiffs, and

14   leave is requested to amend this Complaint to conform to proof at the time of trial.

15             130.  As further proximate result of the negligence of the defendants, and each of

16   them, plaintiffs have lost income, wages, and other pecuniary losses, the full nature and extent
17
     of which is not yet known to plaintiffs, and leave is requested to amend this Complaint to
18
19   conform to proof at time of trial.

20             131. Plaintiffs are informed and believe, and based thereon allege, that defendants,

21   and each of them, have recklessly caused great harm to plaintiffs with full knowledge of the

22   recklessness of their conduct.  Plaintiffs are further informed and believe, and based thereon

23   allege, that defendants' conduct as alleged above was despicable, was carried on with a

24   reckless  disregard of plaintiffs' rights, and subjected plaintiffs to undue hardship.  Therefore,

25   plaintiffs should be awarded punitive and exemplary damages sufficient to punish defendants

26   for engaging in this conduct and to deter similar conduct on their part in the future.

27             132. Pursuant to 15 U.S.C. §2310(d)(2) plaintiffs are entitled to recover their fees and

28

1  costs associated with bringing the present action.

2       133. Pursuant to 15 U.S.C. §2310(e), by virtue of bringing this action, plaintiffs hereby

3  demand that defendants, and each of them, cure the failure to warn plaintiffs and issue a recall

4  of the inherently defective product.

5       WHEREFORE, plaintiffs pray for relief as hereinafter set forth.

6                              **THIRD CAUSE OF ACTION**

7                 **VIOLATION OF MAGNUSSON-MOSS WARRANTY ACT**

8            **(Plaintiffs K. Williams and Schlesinger v. ALL DEFENDANTS)**

9       134. Plaintiffs hereby adopt and incorporate by reference all allegations set forth

10  above as though set forth fully herein.

11       135. The Sleep Number® bed is a "consumer product" as defined in 15 U.S.C.

12  §2301(1).

13       136. Plaintiffs are "consumers" as defined in 15 U.S.C. §2301(3).

14       137. Defendants are "suppliers" as defined in 15 U.S.C. §2301(4).

15       138. SELECT COMFORT is a "warrantor" as defined in 15 U.S.C. §2301(5).

16       139. The SELECT COMFORT Limited Warranty is a "written warranty" as defined in

17  15 U.S.C. §2301(6).

18       140. The Magnusson-Moss Warranty Act applies to the SELECT COMFORT Limited

19  Warranty.

20       141. The Limited Warranty issued by SELECT COMFORT states the Sleep Number®

21  bed will be "free from defects in material and workmanship for a period of twenty (20) years

22  from the original purchase date."  This warranty does not expressly address any remedy or

23  limitation for design defects.  As such, it does not apply to any claim based on a defectively

24  designed product, but only to the defective materials and workmanship associated with the

25  component parts of the product.

26       142. The Limited Warranty provides a limitation only for manufacturing defects

27  which language provides that the customer's "exclusive remedy, in lieu of all incidental,

28

1   special or consequential damages, including for negligence, is limited to repair or replacement

2   of any product or component...<u>Comfort will bear no other damages or expenses</u>." (emphasis

3   added). Defendants' claims that they provide a refund policy for all customers complaining of

4   mold are false.  The warranty is silent as to design defects and even if applicable does not

5   adequately compensate plaintiffs for injuries suffered.  Defendants selectively grant refunds

6   and refuse to provide reimbursement for physical property damages to property caused by

7   their defective product.  Indeed, under the express terms of the limited warranty, they have no

8   obligation for design defects.

9       143. The materials used in the bed are defective in that they do not breathe

10  adequately which leads to moisture collecting on the internal components of the bed.

11  Additionally, the porous nature of the surface of the bladder and the porous nature of the

12  foam layer are defective in that they cannot be cleaned as represented by defendants and

13  therefore mold spores are able to collect and continue to grow and develop in the bed.

14      144. The Sleep Number® bed is a unique patented product manufactured exclusively

15  by SELECT COMFORT.

16      145. The plaintiffs reasonably relied on the Limited Warranty when purchasing the

17  product, since the warranty is advertised and promoted by the defendants.  Plaintiffs would

18  not have purchased the Sleep Number bed were it not for the representations and guarantees

19  of replacement, freedom from defects and the existence of the 20 year warranty.  Said

20  representations became a part of the basis for the bargain.

21      146. Each plaintiff individually attempted to engage the Limited Warranty by

22  notifying the defendants and providing them an opportunity to remedy the alleged defect.

23  Either replacements or repairs as provided for in the Limited Warranty exhibit identical

24  defects as the original Sleep Number® bed, or SELECT COMFORT refused to stand behind its

25  warranty.  Defendants are unable to remedy the defect and have made continued

26  replacements futile.

27      147. Plaintiff KAREN WILLIAMS contacted SELECT COMFORT concerning injuries to

28

1   her son and her son's girlfriend as alleged above – Paragraph (56 through 59). Plaintiff

2   KAREN WILLIAMS corresponded with SELECT COMFORT on May 29, 2007 to confirm that her

3   certified return receipt requested correspondence had been analyzed. In this conversation,

4   plaintiff KAREN WILLIAMS stated that a recall should be obtained. The SELECT COMFORT

5   representative confirmed that she would pass the information along and that her concerns

6   would be addressed for all consumers. Notes taken during the telephone call by plaintiff

7   KAREN WILLIAMS confirm that this SELECT COMFORT received this information and were

8   aware that KAREN WILLIAMS was acting on behalf of all SELECT COMFORT purchasers.

9   Attached hereto as Exhibit D are true and correct copies of these notes written concurrent

10   with the above-reference phone call.

11        148.Defendants, and each of them, were given the opportunity on multiple occasions

12   to provide a limited repair remedy and failed in its essential purpose of producing a bed free

13   from defects causing mold. Most notably, SELECT COMFORT was on notice in 2004 when it

14   was when it was sued for defective design. *Carey v. Select Comfort.* Notwithstanding notice

15   that its design was defective in 2004, defendants did not redesign the inherently defective

16   product, but instead sprayed mold inhibitors on certain parts of the product in the hope the

17   less costly band-aid fix would work. This spray did not alleviate the defect.

18        149.The Limited Warranty provided by SELECT COMFORT is procedurally

19   unconscionable and involves oppression whereby no real negotiation and absence of

20   meaningful choice is present for the consumer. More specifically, the Limited Warranty

21   specifically provides that the terms cover "material and workmanship" and yet claim later that

22   it covers any defect to the product. Misapplication of the warranty to induce customers to

23   forego relief available to them is unconscionable.

24        150.Defendants claim to comply with the warranty by providing replacement

25   component parts, knowing full well that the replacement parts do not correct the defect and

26   that the warranty offers the consumer no choice other than to accept replacement component

27   parts that do not correct the design defect. Consumers are informed they have no other

28

1  choice but these terms as they are uniform and created by and for SELECT COMFORT.

2  Consumers are not provided the opportunity nor does the Limited Warranty provide for the

3  opportunity to negotiate terms which would cover the design defects in question.

4       151.SELECT COMFORT does not provide warranty terms for which the reasonable

5  consumer would be able to guarantee a product that is free from defects in design. SELECT

6  COMFORT is attempting to enforce the terms which attempt to capitalize on the fact that a

7  design defect is not covered by the warranty terms.  Further, it is of extreme shock and

8  surprise to consumers to learn that a defectively designed product is not adequately covered

9  by the warranty and when they are told the warranty only allows them to accept replacement

10  parts that do not correct the problem.  SELECT COMFORT further modifies the terms of the

11  warranty selectively by providing refunds (sometimes incomplete), but does not provide for

12  further remedy to plaintiffs suffering injury from their product.  This ability to void and/or

13  modify the contract only by SELECT COMFORT identifies the warranty's unconscionability.

14       152.The SELECT COMFORT warranty does not provide for that which customers

15  reasonably can expect. SELECT COMFORT uses its ability to fashion and attach the terms to a

16  purchased product in a manner that leaves consumers with no protection whatsoever in the

17  event design defect were to occur.  Even further, defendants then attempt to enforce the

18  Limited Warranty terms against consumers who actually identify the defect and determine

19  not to further continue the futility of replacement component parts.  Defendants knowledge of

20  the defective design; the failure to correct the design; the harsh nature of the terms which

21  collectively work to the advantage of SELECT COMFORT regardless of the circumstances; and

22  the ability of SELECT COMFORT only to void and/or modify the terms of the Limited Warranty

23  result in a substantively unconscionable contract.

24       153.SELECT COMFORT breached the Limited Warranty at the time of its execution in

25  that defendants were aware that a design defect was present in the product, that it could not

26  be repaired and that customers would inevitably be forced to expend additional money to pay

27  for defective replacement parts.

28

FIFTH AMENDED INDIVIDUAL COMPLAINT FOR: NEGLIGENCE; STRICT PRODUCTS LIABILITY; VIOLATION OF MAGNUSSON-MOSS WARRANTY ACT; BREACH OF EXPRESS WARRANTY; AND UNFAIR COMPETITION LAW

1    154. By unilaterally altering and modifying the purchase agreement and paying

2    certain and select purchasers the purchase price for the Sleep Number® bed and by selling a

3    warranty that was unconscionable from execution based on defendants inability to fulfill their

4    obligation to repair – since the defect is irreparable – defendants breached the warranty.

5    Defendants' actions of using the limited warranty to lure customers into believing that the

6    warranty was the exclusive remedy for design defects further breaches the duty to the

7    customers.

8    155. Defendants' attempts to unilaterally modify the limited warranty to include acts

9    and/or omissions by defendants that are not expressly covered are achieved by the vague and

10   unconscionable language used in the express warranty.  Specifically, the limited warranty

11   states: "Select Comfort...warrants to the original purchaser that their Select Comfort sleep

12   system....will be free from defects in <u>material and workmanship</u> for a period of twenty

13   years..." (Emphasis added).  As a direct and proximate result of the acts and/or omissions of

14   SELECT COMFORT, plaintiffs have suffered damages as described hereinabove.

15   156.  Pursuant to 15 U.S.C. §2310(d)(2) plaintiffs are entitled to recover their fees

16   and costs associated with bringing the present action.

17   157.  Pursuant to 15 USC §2310(e), by virtue of bringing this action, plaintiffs hereby

18   demand that defend<u>ants, and each of them,</u> cure the failure to warn consumers and issue a

19   recall of the inherently defective product.

20   WHEREFORE, plaintiffs pray for relief as hereinafter set forth.

21   **FOURTH CAUSE OF ACTION**

22   **BREACH OF EXPRESS WARRANTY UNDER UCC §2-313**

23   **(Plaintiffs individually v. ALL DEFENDANTS)**

24   158.  Plaintiffs hereby adopt and incorporate by reference all allegations set forth

25   above as though set forth fully herein.

26   159.  Plaintiffs are "consumers" as defined in Uniform Commercial Code §2-103(1)(c).

27   160. The Sleep Number® is a "good" as defined in Uniform Commercial Code §2-

28

1 | 103(1)(k).

2 |   161. Defendants, and each of them, are "sellers" as defined in Uniform Commercial
3 | Code §2-103(1)(o).

4 |   162. The States of California and Florida have adopted the Uniform Commercial Code.

5 |   163. Defendant SELECT COMFORT provides an express Limited Warranty with each
6 | Sleep Number® bed purchase.  Said Limited Warranty has remained the same for many years.

7 |   164. The Sleep Number® bed is a unique good.

8 |   165. Defendants advertise the unique benefits of the Sleep Number® bed and that its
9 | unique patented product is different from all other beds.

10 |   166. The Limited Warranty is an express warranty as defined in Uniform Commercial
11 | Code §2-313.

12 |   167. The Limited Warranty provides that "Select Comfort Corporation ("Select
13 | Comfort") warrants to the original purchaser that their Select Comfort sleep system (mattress
14 | and/or foundation) will be <u>free from defects in material and workmanship</u> for a period of
15 | twenty (20) years from the original purchase date." (emphasis added).

16 |   168. The plaintiffs reasonably relied on the Limited Warranty advertised and
17 | promoted by defendants when purchasing the product. Plaintiffs would not have purchased
18 | the Sleep Number bed were it not for the representations and guarantees of replacement,
19 | freedom from defects and remedies provided for in the Limited Warranty for a period of
20 | twenty (20) years and said representations became a part of the basis for the bargain.  The
21 | Limited Warranty issued by SELECT COMFORT states the Sleep Number® bed will be "<u>free</u>
22 | <u>from defects in material and workmanship</u> for a period of twenty (20) years from the original
23 | purchase date." (Emphasis added).The warranty is silent as to design defect and even under
24 | the warranty plaintiffs are not compensated adequately for injuries suffered.  Defendants'
25 | claims that they enforce a refund policy for customers complaining of mold are false.
26 | Defendants selectively grant refunds and refuse to provide reimbursement for physical
27 | property damages to property as caused by their defective product.

28 |

FIFTH AMENDED INDIVIDUAL COMPLAINT FOR: NEGLIGENCE; STRICT PRODUCTS LIABILITY; VIOLATION OF MAGNUSSON-MOSS WARRANTY ACT; BREACH OF EXPRESS WARRANTY; AND UNFAIR COMPETITION LAW

169. The Limited Warranty provides that repair or replacement is the exclusive remedy for the purchaser. The Limited Warranty does not establish or use terminology which would notify the consumer that the Warranty's remedies are not exclusive, do not apply to design defects, and rather, that a refund may be obtained.

170. The Sleep Number® bed is a unique patented product manufactured exclusively by SELECT COMFORT.

171. The plaintiffs reasonably relied on the Limited Warranty when purchasing the product, since the warranty is advertised and promoted by the defendants. Plaintiffs would not have purchased the Sleep Number bed were it not for the representations and guarantees of replacement; freedom from defects for a period of twenty (20) years and said representations became a part of the basis for the bargain.

172. Each plaintiff individually attempted to engage the Limited Warranty by notifying the defendants and providing them an opportunity to remedy the alleged defect. Either replacements or repairs as provided for in the Limited Warranty exhibit identical defects as the original Sleep Number® bed, or SELECT COMFORT refused to stand behind its warranty. Defendants are unable to remedy the defect and have made continued replacements futile as these replacements do not address the design defects. Defendants and each of them refused to perform under the warranty and paid plaintiffs to avoid litigation or public exposure.

173. Defendants, and each of them, were given the opportunity on multiple occasions to provide a limited repair remedy and failed in its essential purpose of producing a bed free from mold defects.

174. SELECT COMFORT breached the Limited Warranty at the time of its execution in that defendants were aware that a defect was present in the product, that it could not be repaired and that customers would inevitably be forced to expend additional money to pay for defective replacement parts.

175. Immediately after finding mold in her bed on April 22, 2008, plaintiff

1  STEARNS contacted SELECT COMFORT to determine what could be done about the mold in
2  her bed. Plaintiff STEARNS notified the representative of her bed's condition and her concern
3  regarding the mold. Plaintiff STEARNS was told by the representative that SELECT COMFORT
4  cannot confirm that replacement parts would not grow mold similar to the mold currently on
5  her bed.

6      176. Plaintiff KAREN WILLIAMS notified SELECT COMFORT in a certified letter and
7  by telephone that the replacement parts had begun to develop mold in the same manner as
8  before. SELECT COMFORT declined to guarantee that further replacement parts would not
9  also result in mold growth. Based on this representation, KAREN WILLIAMS determined that
10 further replacements were futile and thus requested a refund and monetary damage for her
11 son's bedding and for his medical injuries.

12     177. Plaintiff D. SCHLESINGER contacted SELECT COMFORT on September 23,
13 2004 to call concerning mold that he had recently found in his bed. Plaintiff D. SCHLESINGER
14 spoke with a representative who identified himself as JEREMY. Plaintiff D. SCHLESINGER
15 stated that he found mold on the foam and air bladders of his bed. Feeling that his concerns
16 were not being met with enough seriousness, plaintiff D. SCHLESINGER requested to speak to
17 a supervisor and was transferred to a representative who identified herself as KARN HARRER.

18     178.  KARN HARRER stated that she would send two new air chambers, one foam
19 topper and two sleep meter controls. Additionally, HARRER reassured plaintiff D.
20 SCHLESINGER that the new foam was newly formulated and there would be no more mold
21 issues. HARRER instructed plaintiff D. SCHLESINGER to destroy or throw away all of the
22 contaminated items and that there was no need to return them to SELECT COMFORT.

23     179.  Despite these assurances, on August 11, 2008, plaintiff D. SCHLESINGER
24 opened his Sleep Number bed and found mold growing on the foam and both chambers. On
25 August 13, 2008, plaintiff D. SCHLESINGER engaged a mold consultant to test the bed chamber
26 and bedding. The consultant confirmed that the bedding and air chambers were indeed
27 infected with cladosporium mold. Based on this information and at the specialists urging,

28

1  plaintiff D. SCHLESINGER contacted Select Comfort to seek relief. SELECT COMFORT would

2  not provide a refund and only offered replacement parts, identical to those which had just

3  developed cladosporium mold.

4       180.  Previous allegations made through amended complaints have reference the

5  date of August 11, 2009. The date of August 11, 2009 was a clerical error and should have

6  properly stated August 11, 2008.

7       181.  By unilaterally altering and modifying the purchase agreement and paying

8  certain and select purchasers the purchase price for the Sleep Number® bed and by selling a

9  warranty that was unconscionable from execution based on defendants inability to fulfill their

10 obligation to repair – since the defect is irreparable – defendants breached the warranty.

11      182.  The Limited Warranty provided by SELECT COMFORT is procedurally

12 unconscionable and involves oppression whereby no real negotiation and absence of

13 meaningful choice is present for the consumer. More specifically, the Limited Warranty

14 specifically provides that the terms cover "material and workmanship" and yet claim later that

15 it covers any defect to the product. Defendants claim to comply with the warranty by

16 providing replacement component parts, knowing full well that the replacement parts do not

17 correct the defect and that the warranty offers the consumer no choice other than to accept

18 replacement component parts that do not correct the design defect.

19      183.  SELECT COMFORT does not provide warranty terms for which the reasonable

20 consumer would be able to receive a guarantee that a product is free from defects in design.

21 SELECT COMFORT is attempting to enforce the terms improperly to capitalize on the fact that

22 a design defect is not covered by the warranty terms. Further, it is concealed from consumers

23 hat a defectively designed product is not covered by the warranty but they are continually

24 forced to accept replaceent parts that do not correct the problem as their only means of

25 redress. SELECT COMFORT further modifies the terms of the warranty selectively by

26 providing refunds, but does not provide for further remedy to plaintiffs suffering injury from

27 their product. This ability to void and/or modify the contract only by SELECT COMFORT in so

28

1   many diverse regards all to the prejudice of plaintiffs is demonstrative of the warranty's

2   unconscionability.

3         184.   Defendants breached the warranty because they are unable to repair the

4   defective materials and component parts.  The internal components, the defectively designed

5   portion of the bed, have not been treated nor has its design been changed during the period of

6   manufacture of the Sleep Number® bed.  Any attempts by defendants to repair the beds by

7   replacing the internal components are futile absent some change in design.  Defendants have

8   attempted and been unsuccessful in repairing the product.

9         185.   As a direct and proximate result of the acts and/or omissions of SELECT

10  COMFORT, plaintiffs have suffered damages which will be shown according to proof.

11        186.   Pursuant to 15 U.S.C. §2310(d)(2) plaintiffs are entitled to recover their fees

12  and costs associated with bringing the present action.

13        187.   Pursuant to 15 USC §2310(e), by virtue of bringing this action, plaintiffs

14  hereby demand that defendants, and each of them, cure the failure to warn consumers and

15  issue a recall of the inherently defective product.

16        WHEREFORE, plaintiffs pray for relief as hereinafter set forth.

## FIFTH CAUSE OF ACTION

## UNFAIR COMPETITION

### (California Business and Professions Code §§ 17200 et seq.)

### (Plaintiffs Williams and Schlesinger v. ALL DEFENDANTS)

21        188.   Plaintiffs hereby adopt and incorporate by reference all allegations set forth

22  above as though set forth fully herein.

23        189.   Plaintiffs have standing to pursue this claim in that each has suffered an injury

24  in fact and have lost money and/or property as a result of defendants' unfair conduct

25  described herein.

26        190.   The conduct alleged herein is a "business practice" within the meaning of Cal.

27  Bus. & Prof. Code §§ 17200, *et seq.*

28

191.   By reason of the foregoing conduct, defendants have engaged in unlawful and unfair business practices, as defined by Cal. Bus. & Prof. Code §§ 17200, *et seq.*

192.   Defendants', and each of their, conduct in manufacturing, designing, engineering, fabricating, assembling, constructing, testing, examining, distributing and/or marketing the Sleep Number® bed throughout the United States for sale to members of the general public was an unfair, unlawful and/or fraudulent business practice.

193.   Defendants' actions described hereinabove which arise out of defendants' breach of express warranties constitute "unfair" conduct in that defendants are insisting on preventing the public from knowing the full extent of the limited warranty remedies and the potential harm caused by the defect; and that the product as designed cannot be free of defects for twenty years as warranted.   Replacement parts merely start the clock all over again for the mold to appear.

194.   Defendants' policy of failing to notify each and every customer of the mold defect within the Sleep Number bed while at the same time selling the product knowing of the inevitable harm is against public policy.

195.   The sole purpose behind replacement parts was to delay the mold incubation process and obtain more monies from new customers and existing customers through replacement costs similar to a ponzi scheme.

196.   The Sleep Number bed by SELECT COMFORT exhibits design defects that cannot be corrected by reformulation of materials or replacement of component parts. Further, the Sleep Number bed is significantly different from other mattresses in that wetness and other liquids which foster mold have no way of escaping given the design of the Sleep Number bed.   The only way in which defendants could conceivably correct the harm caused to plaintiffs would be to redesign the bed so that air can travel through the bed and moisture cannot remain stagnant.   Defendants despite the knowledge of the design defect have chosen not to do so.

197.   At no time prior to the discovery of mold in their Sleep Number® beds, did

1  SELECT COMFORT notify any of the plaintiffs that their beds were inherently defective, and

2  subject to mold infestation from normal use and potentially hazardous to their health.

3       198.   SELECT COMFORT did not notify consumers that the product was inherently

4  defective, and subject to mold infestation from normal use and that SELECT COMFORT could

5  not repair with replacement components absent a full redesign of the bed.

6       199.   When plaintiffs contacted SELECT COMFORT customer service

7  representatives, none of plaintiffs were informed that the bed was defectively designed and

8  therefore not subject to the limitations in the express Limited Warranty.  Defendants had a

9  duty to make such disclosures and failed to do so in order to obtain a competitive advantage

10  and conceal the fact that their bed is defectively designed which would provide an incentive

11  for other competitors to enter the market or to take advantage of the true state of the market.

12       200.   Defendants' anticompetitive and unlawful conduct as described herein violates

13  the unlawful prong of the Cal. Bus. & Prof. Code §§ 17200, *et seq.,* independent of the causes of

14  action asserted herein.

15       201.   Defendants' conduct offends public policy and is immoral, unethical,

16  oppressive, unscrupulous and substantially injurious to consumers.  Any justification for the

17  alleged conduct is outweighed by the consequences and harm to Plaintiffs.

18       202.   The consumer injury resulting from the defendants' malfeasance is substantial

19  in that plaintiffs are unable to determine or even identify the mold without taking apart the

20  product.  Further, plaintiffs have not been notified to inspect in the event mold has occurred.

21  This failure to notify has resulted in property damage.  Mold in particular has unique

22  properties and is hazardous which make its permanent removal difficult and often time

23  impossible.  Such neutralization is made even more difficult by the lack of visibility that the

24  SELECT COMFORT internal components exhibit.  Inclusion of defect free language for twenty

25  (20) years with knowledge at the time of making the statement that the product and its

26  replacement parts are defective by design is improper and unfair competition..

27       203.   This injury to consumers is not outweighed by any countervailing benefits to

28

1    the manufacturer since notification to consumers would cost significantly less than a full

2    product recall. The cost of submitting post cards or some other form of mass communication

3    to consumers would be significantly less than the ongoing defect, replacement and denial

4    system that SELECT COMFORT currently employs.

5       204.    The property damage attributable to the Sleep Number® bed and more fully

6    described in paragraphs above is substantial in amount and content. The property described

7    is a total loss and damaged beyond repair. Perhaps most importantly, this damage is not

8    always visible to the naked eye and requires specialized knowledge to detect and correct.

9    Similar to the hidden nature of the mold origin, the mold spores which attach to the bedding

10    are difficult to detect and therefore, the fact that SELECT COMFORT and its partner retailers

11    have not notified or attempted to reimburse consumers for these injuries causes this to be a

12    significant injury within the definition of the UCL and case authority.

13       205.    As described by each plaintiff above, the property damage can vary and in

14    some cases can escalate into the thousands of dollars. Consequently, the property damage is

15    outside of a de minimus characterization. Plaintiffs were forced to replace their property as a

16    direct result of the defectively designed product. Making this damage even more substantial,

17    defendants could have prevented the harm which resulted to plaintiffs' property by sending

18    out a notice and/or correcting the mold issue for those beds that exhibit the product defect.

19       206.    The design defect of the Sleep Number bed offends an established public policy

20    because regardless of what steps defendants may take to replace component parts, the

21    identical mold will occur since the design of the bed is defective. The number of replacements

22    is irrelevant and does nothing to alleviate the damage caused to consumers since the design

23    must be corrected. Even worse, defendants rely on a Limited Warranty that does not

24    guarantee what it purports to – provide a defect free bed (material and workmanship) for

25    twenty years.

26       207.    The Sleep Number bed and the practice of replacing defective replacement

27    parts; failing to notify consumers and refunding to only select consumers is immoral,

28

1 unethical, oppressive and unscrupulous. The defendants having received information from

2 customers such as <u>KAREN</u> WILLIAMS describing in great detail that mold had been attributed

3 to their product and that component parts did not correct the problem further demonstrates

4 this unethical policy.

5      208. SELECT COMFORT and defendants have instituted and continue to institute a

6 practice that is substantially injurious to consumers by taking the following actions: failing to

7 redesign the bed; continuously reassuring customers that mold does not exist – when all

8 consumer correspondence point to the contrary; failing to send out nationwide notice for

9 consumers to check their beds; replacing components when defendants are aware that

10 identical mold will incubate because of the root design defect; and using the Limited Warranty

11 against its consumers despite its futility, inapplicability and ineffective purpose.

12      209. Consumers could not reasonably have avoided the injury herein since most

13 consumers would never know to inspect the bed for mold. Defendants also claim the internal

14 components of the bed are maintenance-free thereby eliminating the need to investigate the

15 product. Plaintiffs, by invoking the limited warranty and relying on the representations,

16 attempted to remedy the defect and relied on the representations of safety. Mold and mildew

17 are intrinsically harmful and are unable to be cleaned or maintained. The only way in which a

18 consumer would even become aware of the bed is if the mattress is unzipped or taken apart

19 for other purposes such as moving or a structural problem requiring investigation.

20      210. The Sleep Number Bed is an unreasonably dangerous product because

21 consumers are in fact sleeping on mold which may cause personal injury and economic

22 damages. Plaintiffs have no way of knowing of this hazardous mold without unzipping the

23 bed. However, unzipping the bed does not alleviate the problem. Also, consumers would have

24 no way of knowing of the mold without being told by defendants. Therefore, the only way to

25 make the unzipping feature of the bed successful is to provide all consumers notice.

26 Defendants' vague reference buried in websites and internet postings are not sufficient based

27 on the damage that has been caused to plaintiffs' property and persons.

28

FIFTH AMENDED INDIVIDUAL COMPLAINT FOR: NEGLIGENCE; STRICT PRODUCTS LIABILITY; VIOLATION OF MAGNUSSON-MOSS WARRANTY ACT; BREACH OF EXPRESS WARRANTY; AND UNFAIR COMPETITION LAW

1    211.    Plaintiff SCHLESINGER first found mold in his bed on September 23, 2004

2    while in the process of realigning the air chambers.  Plaintiff SCHLESINGER was provided

3    replacement parts and assurances by SELECT COMFORT that the bed would not continue to

4    have mold.  Plaintiff SCHLESINGER again found mold on August 11, 2008 while in the process

5    of checking the bed.

6    212.    Previous allegations made through amended complaints have reference the

7    date of August 11, 2009.  The date of August 11, 2009 was a clerical error and should have

8    properly stated August 11, 2008.

9    213.    Plaintiffs KAREN WILLIAMS and BRYAN WILLIAMS first found mold in BRYAN

10   WILLIAMS bed on October 26, 2006 and December 30, 2006 while in the process of inspecting

11   the bed for mold growth as instructed by SELECT COMFORT in their product manual and at

12   the urging of toxicologist.

13   214.    Plaintiffs and each of them could not have discovered the mold earlier as

14   SELECT COMFORT beds at the time of each plaintiffs purchase did not include any information

15   or instructions regarding regular maintenance.  Although the bed can be opened, unless

16   something were wrong or the bed; the bed needed to be moved or taken apart; or the mold

17   manifested itself on the out frame of the mattress; plaintiff would not have discovered the

18   mold inside.

19   215.    Despite thousands of complaints and at least one lawsuit for the defect in

20   2004, SELECT COMFORT has done nothing to change its design to address the failure of the

21   bed to properly be ventilated in order to avoid prolonged moisture and the attendant growth

22   of mold in the beds.

23   216.    Plaintiffs have paid for shipping costs for the product and replacement parts

24   the manufacturer knew were defective at the time of purchase.  Plaintiffs' monies to

25   defendants despite the known defect at the time of purchase.  Plaintiffs would not otherwise

26   have paid these costs had the true condition of the product been known or had notice been

27   provided of the defect.

28

217.   Plaintiff surrendered more in their transactions with defendants than they would otherwise have had they been made aware of the defect at the time of purchase and had a present and future property interest diminished through this transaction.  By way of the warranty plaintiffs were deprived monies and were forced to enter into the transaction that was unnecessary based on defendants' inability to correct the defect and comply with the 20 year warranty of a defect free bed.

218.   Plaintiffs seek injunctive relief in the form of an order of this court preventing defendants from continuing this unfair business practice pursuant to Business and Professions Code § 17203.

219.   Plaintiffs further seeking injunctive relief in the form of an order of this court compelling defendants to recall the Sleep Number® beds manufactured between 1987 and the present date, or in the alternative, to provide notice to all consumers of the inherently defective condition of these Sleep Number® beds and consumers to open and inspect their beds on a periodic basis, but not less than quarterly.

220.   Plaintiffs seek further injunctive relief in the form of written warranty which expressly provides for the refund policy defendants have stated in this litigation to exist in the event mold is discovered and which does not allocate replacement costs to the consumer once a replacement part has developed mold.

221.   As a direct and proximate result of the purchase and proper use of the inherently defective product, defendants have been unjustly enriched by plaintiffs' payment of consideration in the purchase of the bed, shipping costs for defective replacement parts and fees for disposal to SELECT COMFORT.  As such, plaintiffs seek an order requiring defendants to make full restitution of monies it has wrongfully obtained from plaintiffs, along with other relief allowable under California Law.

222.   By bringing this action, plaintiffs are entitled to attorneys' fees and costs as private attorney general.

WHEREFORE, plaintiffs pray for relief as hereinafter set forth.

## PRAYER FOR RELIEF ON ALL CAUSES OF ACTION

WHEREFORE, plaintiffs pray for relief as follows:

1. For general and special damages according to proof;

2. For consequential damages;

3. For costs of suit incurred herein;

4. For punitive and exemplary damages;

5. For attorneys' fees and costs;

6. For pre- and post-judgment interest as allowed by law;

7. For all injunctive relief in the form of a court order compelling defendants to provide notice to its customers that they should open their beds; look for mold; and contact SELECT COMFORT if they find mold in order to obtain a refund and damages as established according to proof; and

8. For such other and further relief as this Court deems proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATE: June 15, 2011                    BUSTAMANTE O'HARA & GAGLIASSO


_____/S/_____
ROBERT M. GAGLIASSO
ANDREW V. STEARNS
STEVEN M. BERKI
Counsel of Record for Plaintiffs

1    Plaintiffs hereby incorporate by reference previously dismissed claims pursuant to

2  Ninth Circuit Court opinions and attach them hereto as Exhibit 1. *Pack v. McCausland; New*

3  *York City Emples. Ret. Sys. v. Jobs.* Plaintiffs provide these allegations as alleged in the First

4  Amended Complaint filed on October 30, 2008. [Document No. 29]. Claims are hereby

5  incorporated by reference and are identical to those originally alleged and have not been

6  altered or amended in any manner. Further, these allegations have been separated from the

7  operative allegations above and are for purposes of preserving all rights on appeal.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28